The CLARKSON COMPANY LIMITED, as Trustee in Bankruptcy, appointed by the Supreme Court of the Province of Newfoundland, of the Property of Newfoundland Refining Company Limited and Provincial Refining Company Limited, Plaintiff,

v.

John M. SHAHEEN, Roy M. Furmark, Albin W. Smith, Peter L. Caras, Paul W. Rishell, Shaheen Natural Resources Company, Inc., Newfoundland Refining Company Ltd., U.S.A., and Founders Corporation, Defendants.

The CLARKSON COMPANY LIMITED, as Trustee in Bankruptcy, appointed by the Supreme Court of the Province of Newfoundland, of the Property of Newfoundland Refining Company Limited and Provincial Refining Company Limited, Petitioner,

v.

SHAHEEN NATURAL RESOURCES COMPANY, INC., John M. Shaheen, Macmillan Ring-Free Oil Co., Inc., and Ian W. Outerbridge, Respondents.

No. 76 Civ. 1373.

United States District Court, S. D. New York.

Oct. 27, 1981.

White & Case, New York City, for The Clarkson Company Limited; Jeffrey Barist, Edna Sussman, New York City, of counsel.

Spengler, Carlson, Gubar & Brodsky, New York City, for Ian Outerbridge; Thomas H. Sear, Cynthia M. Brill, New York City, of counsel.

Saxe, Bacon & Bolan, P.C., New York City, for John M. Shaheen and Shaheen Natural Resources Co., Inc.; Thomas A. Andrews, New York City, of counsel.

Trubin, Sillcocks, Edelman & Knapp, New York City, for Macmillan Ring Free Oil Co., Inc.; Roger Crane, Jr., New York City, of counsel.

OPINION AND ORDER

OWEN, District Judge.

On July 22, 1980, following a jury verdict, a judgment in the total amount of $50

million was entered in favor of the plaintiff in *Clarkson Company Limited v. John M. Shaheen, et al.,* No. 76 Civ. 1373 ("the main action" or "the principal action").[1] Thereafter, the Clarkson Company Limited ("Clarkson"), the judgment creditor, brought various supplementary proceedings to enforce its judgment over which this Court had and took jurisdiction.

Clarkson, a Canadian corporation, was and is acting as a Trustee in Bankruptcy in the Province of Newfoundland.

Newfoundland Refining Company, Limited and Provincial Refining Company, Limited, ("NRC" and "PRC") were engaged in the operation of an oil refinery at Come-By-Chance, Newfoundland. PRC was the wholly-owned subsidiary of NRC and owned the refinery which NRC managed. Both corporations were part of a complex of other corporations monarchically-owned or controlled by John Shaheen. They went bankrupt in 1976, and title to all the property of PRC and NRC vested in Clarkson upon its appointment as Trustee in Bankruptcy of PRC and NRC by the Supreme Court of the Province of Newfoundland.

Shaheen Natural Resources Company, Inc. ("SNR"), a respondent in these supplementary proceedings, was a principal defendant in the main action. SNR, an Illinois corporation with its principal office at 90 Park Avenue, New York City, suffered a judgment in the amount of $46,049,040 with interest from March 13, 1976. The judgment is unsatisfied.

John M. Shaheen ("Shaheen"), also a respondent in these supplementary proceedings, was also a principal defendant in that action. Clarkson's judgment against him included, *inter alia,* the sum of $23,151,910, together with interest from March 13, 1976. The judgment is unsatisfied.

Shaheen controls SNR, owning all of its common stock.

Respondent Outerbridge is a citizen and resident of the Province of Ontario, Canada.

He is a Canadian lawyer, "Queen's Counsel," and has been Shaheen's primary counsel in Canada.

Respondent Macmillan Ring-Free Oil Co., Inc. ("Macmillan") is a Delaware corporation with its principal place of business in New York. It is a "public company" of which SNR owns 13.5% of its stock, Founders Corporation, another Shaheen company, owns 28.3%, and a handful of stock is owned by Shaheen individually. Shaheen is also Macmillan's president, a director, and, through his stock ownership of SNR (100%-owned by Shaheen) and Founders (55%-owned by Shaheen), has held the controlling block of more than 40% of the common stock of Macmillan since at least 1974.

In July, 1980, at the time of the jury's verdict and the subsequent entry of judgment, SNR was the owner and had possession of 235,175 shares of common stock of Macmillan. Two months thereafter, on September 16, 1980, SNR confirmed in an information subpoena that it still had not transferred possession of any of those shares.

However, on December 5, 1980, in responding to Clarkson's motion for a turnover order, Shaheen, by affidavit, for the first time advised counsel and this Court that on July 31, 1980, 185,723 shares of Macmillan stock owned by SNR *had been transferred* to Outerbridge as part of an agreement signed by Outerbridge, SNR, and Shaheen. The shares at that time had a value of some $750,000.

Following a hearing on December 5, 1980, this Court enjoined Macmillan and its transfer agents from *any* transfer of *any* of the Macmillan shares of which SNR was the record owner.

On December 8, 1980, the Court, at Clarkson's request and over the objection of counsel for Shaheen and SNR, ordered Outerbridge to retain and preserve the 185,273 shares of Macmillan, to refrain from transferring them, and to preserve the dividends

---

1. This judgment has been affirmed on appeal. *The Clarkson Company Limited, et al. v. Sha-* *heen, et al.,* 660 F.2d 506 (2d Cir. 1981).

and proceeds thereof. The Court's order was communicated to Outerbridge on December 8, 1980.

Thereafter, by an Order to Show Cause on January 28, 1981, Clarkson commenced a supplementary proceeding against SNR, Shaheen, Macmillan, and Outerbridge seeking, *inter alia*, an order requiring SNR and Outerbridge to turn over to Clarkson the 185,723 shares of stock in Macmillan held by Outerbridge.

By letter dated February 4, 1981, Messrs. Spengler, Carlson, Gubar and Brodsky ("the Spengler firm") informed this Court that they were appearing for Outerbridge. Thereafter, Outerbridge submitted himself to this Court's jurisdiction.

A hearing was held on March 13, 1981, following which the Court, which at first directed that Outerbridge continue to hold the shares, but as "Trustee" for the Court, on further consideration directed that the Macmillan shares held by Outerbridge be placed within the very jurisdiction of the Court and ordered the Spengler firm to take possession of and hold them for the Court. This was done.

In his affidavit of December 5, 1980, Shaheen states under oath that the shares were transferred to Outerbridge, to quote Shaheen, "in payment of legal fees *then owing* from SNR to the Canadian law firm of Outerbridge, Thomas, Mueller & Betts and four other leading Canadian law firms which *had rendered* services over a four year period. The indebtedness to these firms *was* in the approximate sum of $2,000,000, . . . ." (emphasis supplied). In later testimony, Shaheen again stated that the shares were transferred to Outerbridge in payment of past debts.

It is clear from Shaheen's affidavit of March 11, 1981, however, that these earlier sworn statements by Shaheen to the Court were utterly false. In the March affidavit, seven and one-half months after the transfer, Shaheen swears that the transfer was both for past services rendered and future services to be rendered. Moreover, instead of $2 million being due and owing as of June 1980, Shaheen claimed that only $300,-

000 *was due* and that much of that—a comparison of his and Outerbridge's affidavits reveals—was incurred in the seven and one-half months *after* the stock had been transferred and, therefore, was for future services.

This is made clear from the Outerbridge affidavits, which had annexed to them copies of bills for past legal services which showed less than $51,000 due at the time of the July 31, 1980 transfer of the Macmillan shares. An extremely generous reading of other Outerbridge exhibits could lead to the conclusion that an additional $58,000 was at sometime due and owing to four other Canadian law firms which had been retained by Outerbridge for Shaheen. However, the evidence of this indebtedness appears in the various correspondence occurring sometime after the transfer, without any showing of whether the work was done before or after. I am inclined not to credit this correspondence for the purpose of determining Shaheen's existing debt *prior* to July 31, 1980.

Also significantly, the agreement itself by which the shares were transferred, and signed by both Shaheen and Outerbridge, recites that the transfer was to collateralize payment of *future services*. While Outerbridge now contends that the agreement and the transfer were for payment of past *and* future legal services, he, an experienced lawyer, has not attempted to explain why, if the agreement was for payment for past services, it makes no reference whatsoever to payment for past services.

The agreement gave Outerbridge the right to liquidate the stock as necessary to cover future defaults in payment by Shaheen and the Shaheen companies. Nearly contemporaneous letters written by Outerbridge, however, make clear that Shaheen had not surrendered control of the stock and that in Outerbridge's mind, the shares ultimately would be returned to Shaheen and SNR. Moreover, the pledge was never reflected on the transfer books of Macmillan, and, there being no restriction on voting in the agreement, SNR as record owner had the right to vote the pledged stock.

Next, notwithstanding various "opinion letters" from Shaheen's later counsel and Outerbridge to the contrary, it is absolutely clear that the Court, immediately following the jury returning its verdict on July 1, 1980, had prohibited into the indefinite future any future transfers of assets and that all parties to the action understood that all transfers were thereafter prohibited. The colloquy embodying the foregoing was as follows:

MR. GOULD [Trial counsel for Shaheen and the Shaheen companies and lead counsel for all defendants]: The defendants, personal defendants, are here in court and I think that coupled with a request of this kind, there should be an undertaking by them that there will be no transfers of assets pending the entry of judgment.

I have discussed this matter with Mr. Barist in anticipation of a verdict and I understand that he acquiesces in this and I think I have authority to speak for Ms. Lea and Mr. daParma.

So that if your Honor feels that is a reasonable way to proceed, I would suggest that we have the individual defendants respond to the question or, rather, affirm to the Court that there will be no transfers of any property pending the entry of a judgment.

MR. BARIST [counsel for Clarkson]: Your Honor, I do acquiesce in what Mr. Gould suggests. I would also request that in addition to the affirmance by the individual defendants that your Honor so direct and after speaking to Mr. Gould it did not come back to my attention that Mr. Smith is not in the courtroom and I assume that Ms. Lea has not had the opportunity even to speak to Mr. Smith about this, and I would, under the circumstances, ask simply that your Honor direct that Mr. Smith so abide by this agreement and ask Ms. Lea to convey your Honor's oral direction to Mr. Smith.

Is that agreeable, Ms. Lea?

MS. LEA [counsel for individual defendants Smith, Gandert, Caras, Rishell and Sheridan]: It is.

THE COURT: Any problem with that?

MR. daPARMA [counsel for individual defendant Furmark]: No, your Honor.

THE COURT: I will make it an order of the Court that there be no transfer of assets by any defendant, individual or corporate, pending the entry of a judgment here.

MR. GOULD: Once the judgment is entered then the process takes over by itself.

THE COURT: So that is an order of the Court and I gather, Mr. Shaheen, you are agreeable to abide by that order?

MR. SHAHEEN: Yes, sir.

Thereafter, the judgment was submitted and signed by this Court and entered by the clerk on July 22, 1980, and, under Rule 62(a) of the Federal Rules of Civil Procedure, execution of the judgment was automatically stayed for 10 days. The transfer of the shares to Outerbridge allegedly occurred on July 31, 1981, the last day before the expiration of the 10-day stay provided by Rule 62(a). I reject the present contention of SNR, Shaheen, and Outerbridge that this Court's order of July 1 was effective only until July 22 and that the Rule 62 automatic stay freed SNR and Shaheen, who were then subject to a judgment for many millions of dollars, to transfer away assets, at the same time that Rule 62 prevented the judgment creditor from levying upon them.

Moreover, I find that the improbability of such a construction is further demonstrated by the absence of any statement or affidavit from Mr. Gould, Shaheen's trial counsel, on the subject. The absence of such an affidavit permits me to conclude that the Court's order was meant and understood by Shaheen's counsel to protect the judgment creditor by restraining all transfers by defendants.

Shaheen himself, in the days following the entry of judgment, expressed the same understanding. In a telex sent by Shaheen to the Trustee, dated July 28, 1980, three days before the Outerbridge transfer and during the ten-day stay of execution, Shaheen asked Clarkson to delay enforcement of its judgment, urging that a standstill

could not hurt Clarkson because "... all transfers of assets of the defendants are stayed in the New York suit ...." Accordingly, I find that during the period in question John M. Shaheen knew, as he had represented to the Court on July 1, (see *supra*), that he and the defendant corporations which he controlled, had agreed not to transfer thereafter any assets.[2]

Outerbridge concedes that he knew of this Court's restraint on transfers entered on July 1, 1980. Outerbridge also has told the Court that the said July 28, 1980 telex sent by Shaheen to Clarkson, in which Shaheen states that all transfers are stayed in this action, "embod[ies] legal advice given by me ..." to Shaheen.

The transfer records of Macmillan show that SNR is still listed as the record owner of the Macmillan shares. At this Court's direction the certificates themselves are now with the Spengler firm, having been taken from Outerbridge's possession in Canada and placed within this Court's jurisdiction and control. Whether or not Outerbridge *received* the shares in willful violation of this Court's order, it is clear that the *transfer* itself was in violation of the order.

By letter to Shaheen dated July 30, 1980 Outerbridge states that he has reviewed both the transcript of proceedings before me and the judgment entered on July 22, 1980 and renders an "opinion" that Shaheen lawfully could advance funds to Canadian counsel, namely, himself. Outerbridge is not a member of the Bar of the State of New York or any other state of the United States. He admits his ignorance of federal procedure, stating that he was unfamiliar with the automatic ten-day stay period of the Federal Rules of Civil Procedure. Shaheen and his corporations, represented on July 31, 1980 by Shea & Gould, trial counsel, and Saxe, Bacon, & Bolan, ultimately appellate counsel, could not reasonably have relied upon this "opinion" of foreign counsel as to New York law. In addition, I find

that Outerbridge's purported reliance on an opinion of "New York counsel" as to the propriety of the transfer adds nothing to his attempt to demonstrate either good faith or a legal basis for his own advice about the transfer. Despite the Court's inquiry about an opinion letter of the "New York counsel" Outerbridge consulted, no letter has been produced and no such counsel has been identified. Moreover, at no time did any party to the transfer consult the Court as to whether a transfer on July 31 was permitted by the order of July 1.

I find further that Outerbridge's failure to authorize his counsel to file a Schedule 13D with the Securities Exchange Commission until December 8, 1980 is evidence of his bad faith in accepting the transfer of the shares. His counsel in Washington, D.C. advised him in very clear terms on October 6, 1980, that Rule 13d–1 of the Securities Exchange Act of 1934 required that he file such a schedule disclosing his beneficial ownership of the stock. Although he was required to file the form within ten days of the transfer, he did not authorize the filing until December 8, 1980, *three days after Shaheen revealed to the Court for the first time that the transfer had occurred more than four months earlier.*

Accordingly, I find that neither Shaheen, nor SNR, nor Outerbridge acted in good faith with respect to both the restraining order of July 1, 1980 and the stock transfer in general.

The value of the stock Shaheen and SNR transferred to Outerbridge was approximately $750,000 at the time of the transfer. (The stock was then trading at about $4.00 per share.) Shaheen and SNR's indebtedness to Outerbridge at that time was approximately $51,000 or, if the alleged and questionable indebtedness to other Canadian counsel is included, a maximum of $109,-000. I find, therefore, that the value of the

---

**2.** I note that Shaheen's present attorneys, in an opinion letter of July 31, 1980, the very day of the transfer to Outerbridge, recognized that the entry of Clarkson's judgment operated to continue the restriction on the transfer of assets,

as Mr. Gould had assured the Court it would at the time of the jury verdict. In the very words of Shaheen's counsel, the assets were "subject ... to the lien of the judgment entered in ..." the main action.

pledged stock was grossly disproportionate to any antecedent debt Shaheen and SNR owed Outerbridge.

In addition, I find that the legal services, the performance of which the transfer of these shares was designed to secure, were open-ended, indefinite, of highly uncertain duration, for undefined clients, and quantitatively more significant than any services theretofore provided Shaheen and SNR.

The total amount claimed by Outerbridge as having been performed by him and the lawyers he hired on behalf of the Shaheen interests was approximately $386,000 as of January 31, 1981. The sole substantiation for that amount is a bill dated February 9, 1981. This bill was rendered after Clarkson had, on January 28, 1981, instituted suit against Outerbridge for return of the Macmillan shares. Neither hours nor hourly rates are set forth, and, claiming privilege, Outerbridge has refused to produce any time records or diaries.

Moreover, insofar as the future services represented a continuation of any legal work Outerbridge had begun for Shaheen and SNR before the time of the transfer, I find that virtually all of the services secured by the transfer were yet to be performed and were not restricted to reasonably narrow pending, or essential services.

Further, noting again that 1) on July 1, 1980, a jury in this case found that SNR was insolvent in 1974, 1975, and 1976, 2) a judgment based in part on that finding of insolvency was entered against SNR and exceeded $45 million, and 3) Shaheen himself testified that the Macmillan shares transferred to Outerbridge were among SNR's last remaining assets,[3] I find that at the time of its transfer to Outerbridge of 185,723 shares of Macmillan stock, SNR was insolvent.

Given all the foregoing, I conclude that the transfer by Shaheen and SNR to Outerbridge of SNR's holdings of shares of Macmillan was in violation of this Court's restraining order of July 1, 1980. Further, the transfer by Shaheen and SNR to Outerbridge of SNR's shares in Macmillan was a fraudulent conveyance within the meaning of Section 273 of the New York Debtor and Creditor Law, N.Y. Debt. & Cred. Law § 273 (McKinney), in that it occurred at a time when SNR was insolvent and was neither for fair consideration nor in good faith. In this connection, I note that a transfer of assets to a lawyer to secure payment for vague and extended *future* services in a commercial venture is not fair consideration. *Compare In re Gordon*, 3 N.Y.S. 589 (4th Dep't 1888) *with Hay v. Duskin*, 9 Ariz.App. 599, 455 P.2d 281 (Ct.App. 1969). In addition, the transfer by Shaheen and SNR to Outerbridge of the said shares of Macmillan was a fraudulent conveyance within the meaning of Section 273-a of the New York Debtor and Creditor Law, N.Y. Debt. & Cred. Law § 273-a (McKinney), in that it occurred at a time when a judgment for money damages against SNR had been docketed, was neither for fair consideration nor in good faith, and SNR has failed to satisfy the judgment. Finally, the transfer of the Macmillan shares by SNR to Outerbridge was, I conclude, in violation of Section 276 of the Debtor and Creditor Law as a conveyance made with the intent to hinder, delay, and impede Clarkson and other creditors of SNR in the collection of debts due from SNR.

It therefore follows that: 1) Clarkson is entitled to the said shares pursuant to New York C.P.L.R. § 5225(b); 2) the Spengler firm is directed to turn the certificates over to Clarkson; and 3) Macmillan is directed to effect, on its books, the transfer of said shares to Clarkson.[4]

---

**3.** I note that no other assets of substantial value are disclosed in the SNR information-subpoena return.

**4.** The Court recently has been informed that restraining notices have been served on the Spengler firm restraining transfer of the said shares. Accordingly, if the Spengler firm is so minded, it may deposit with the Court the shares in issue and commence forthwith an action in the nature of interpleader in the United States District Court for the Southern District of New York.

The foregoing constitutes the Court's findings of fact and conclusions of law and is so ordered.