The CLARKSON COMPANY LIMITED, et al., Plaintiffs,

v.

John M. SHAHEEN, et al., Defendants.

The CLARKSON COMPANY LIMITED, etc., Petitioners,

v.

SHAHEEN NATURAL RESOURCES CO., etc., Respondents,

Spengler, Carlson, Gubar, Brodsky & Rosenthal, Cowan, Liebowitz & Latman, P. C., etc., Additional Respondents.

No. 76 Civ. 1373.

United States District Court, S. D. New York.

July 27, 1982.

See also, 2 Cir., 660 F.2d 506, D.C., 533 F.Supp. 905, D.C., 525 F.Supp. 625.

White & Case, New York City, for plaintiff/petitioner The Clarkson Co. Ltd.; Jeffrey Barist, Allan L. Gropper, Kevin Ashley, New York City, of counsel.

Saxe, Bacon & Bolan, P. C., New York City, for defendants/respondents John M. Shaheen, Shaheen Natural Resources Co., Inc., Founders Corp.; Thomas A. Andrews, Filip L. Tiffenberg, New York City, of counsel.

Joseph S. Siegel, New York City, for defendants/respondents Imafina S. A. and Hubert Hendrickx.

Pryor, Cashman, Sherman & Flynn, New York City, for defendants/respondents Macmillan Ring-Free Oil Co.; Gideon Cashman, James A. Janowitz, Donald S. Zakarin, Arthur Engoron, New York City, of counsel.

## OPINION AND ORDER

OWEN, District Judge.

Petitioner, The Clarkson Company Limited ("Clarkson"), seeks a preliminary injunction voiding a purchase agreement dated December 3, 1981, between Imafina S. A. ("Imafina") and Macmillan Ring-Free Oil Company, Inc. ("Macmillan"), a public company engaged in the refining of petroleum products. Under the agreement in question, Macmillan agreed to transfer a quantity of its shares to Imafina in exchange for $1.8 million dollars (the "Imafina transaction"). Based upon the evidence adduced at a hearing held on January 14 and 18, 1982, I hereby grant the injunctive relief sought by petitioner and declare the Imafina transaction void.

In July, 1980, following a jury verdict, judgments were entered in favor of Clarkson against John M. Shaheen for approximately $46 million, against Shaheen Natural Resources ("SNR") for approximately $46 million, and against Founders Corporation ("Founders") for approximately $550,000. Since that time, Clarkson has diligently endeavored to enforce those judgments.

The principal asset of all three judgment debtors is Shaheen's controlling stock inter-

est in Macmillan via his 100% ownership of SNR and his 55% ownership interest in Founders, *see The Clarkson Company Ltd. v. Shaheen,* 533 F.Supp. 905 (S.D.N.Y.1982). In order to recover on this combined asset, Clarkson commenced special proceedings.

In substance, the Court has already ordered that "substantial blocks totalling forty-two percent of the outstanding Macmillan common stock owned by the three judgment debtors—control shares—be turned over to or for the benefit of Clarkson." But for the Imafina transaction, these shares, which total 728,458 shares of Macmillan common stock, would constitute the control shares of the company. The Imafina transaction, had it gone as planned, would have reduced Clarkson's holdings from 42% to 30%, destroyed its control status, and placed 26% of Macmillan's stock in Imafina's hands.

On March 12 and 31, 1981, I issued orders protecting Clarkson's holdings in Macmillan which in pertinent part prohibited Macmillan from transferring "any property . . . to . . . Shaheen, SNR, or Founders, except pursuant to an order of the court."

Against this background, Macmillan entered into a transaction in December, 1981 whereby 627,178 shares of authorized but unissued shares of Macmillan common stock were sold to Imafina, a Swiss corporation wholly owned by one Hubert Hendrickx ("Hendrickx").

On December 14, 1981, I issued a further order prohibiting Macmillan from taking any action which would devalue Clarkson's holdings in it. Although I recount the specifics of this transaction in greater detail below, I note at this time that Macmillan and Imafina have agreed to "rollback" the portion of the purchase agreement pertaining to 227,178 shares of Macmillan which were transferred to Imafina, as the proof showed, in surreptitious, brazen and knowing violation of this Court's order of December 14, 1981. Today, therefore I need only consider whether the Imafina transaction violated the earlier March 12 and 31 court orders. Because I find that the transaction

did in fact violate those orders as well, Clarkson's motion is granted.

I decline to recount again here the long contentious history of this action. Familiarity with that history is presumed. *See Clarkson Co. Ltd. v. Shaheen,* 660 F.2d 506, 508 (2d Cir. 1981); *Clarkson Co. Ltd. v. Shaheen,* 533 F.Supp. 905, 917, 931 (S.D.N.Y.1982); *Clarkson Co. Ltd. v. Shaheen,* 525 F.Supp. 625, 630 (S.D.N.Y.1981).

I turn first to certain preliminary legal questions raised by respondent's papers.

## I.

### The Court's Jurisdiction

■ Macmillan, in the first instance, contends that this court lacks jurisdiction either to enjoin it from transferring its securities to a third party or to undo such a transfer once it has been consummated. In these terms, Macmillan's argument today repeats a legal theory which it first proffered before the Court of Appeals in its petition for a writ of mandamus dated December 24, 1981. Macmillan urges that this court lacks jurisdiction to enter such an injunction (1) because Hubert Hendrickx ("Hendrickx"), the sole owner of Imafina, and Imafina are not parties to this action, and (2) because Clarkson has failed to commence an independent plenary proceeding against those parties. Macmillan unfortunately has framed the issue before us in this proceeding in a way which clouds the real inquiry.

The issue now before the court, in Macmillan's view, constitutes a proceeding to recover property of a judgment debtor in the hands of third party. That view, however, ignores the contentious history of the Clarkson-Shaheen relationship. Rather than being part of a new action, today's proceedings are only another step by Clarkson in a long series of steps to protect its judgment against Shaheen's efforts to frustrate it or destroy its value. At root, what is really before me today is whether this court has the power to support and sustain its earlier decisions. When considered in

this appropriate way, nothing could be clearer than this court's jurisdiction.[1]

## II.

### Neither Hendrickx nor Imafina Is an Indispensable Party

■ Macmillan next contends that both Hendrickx and Imafina are indispensable parties and that this action must be dismissed in their absence pursuant to Rule 19(b). That rule states that where a person who should be joined if feasible, "cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Without doubt both Hendrickx and Imafina should be joined if feasible. However, I note that the joinder of either of these two parties would deprive this court of subject matter jurisdiction [2] and is therefore not required under Rule 19(a). *See Dassigienis v. Cosmos Carriers & Trading Corp.*, 442 F.2d 1016 (2d Cir. 1977); *Karakatsanis v. Conquestador Cia. Nav. S. A.*, 247 F.Supp. 423 (S.D.N.Y.1965). I am thus constrained to consider the application of Rule 19(b) to our facts.

■ Rule 19(b) sets forth four criteria for a court to consider in deciding whether to dismiss an action because of the absence of a person:

first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Having considered these as well as the court's interest in the effective, expeditious resolution of this suit, I conclude that neither Hendrickx nor Imafina is indispensable to the resolution of this dispute. I note particularly that the rescission of the purchase agreement will merely restore both Hendrickx and Imafina to the *status quo ante* December 3, 1981. Dr. Hendrickx simply will not be prejudiced by this result. In fact, pursuant to the express terms of the agreement, he will not even bear the burden of paying legal fees to his counsel on the issue before me.

## III.

### The Imafina Transaction Violates the March 12 and 31, 1981 Court Orders

■ On March 12, 1981, Clarkson obtained a temporary restraining order against Macmillan prohibiting Macmillan, in pertinent part

from making or accepting any sale, assignment, transfer, or pledge of any property or money or debt to or from Shaheen, SNR, or Founders . . . pending further order of this Court, or until petitioner's judgment is satisfied or vacated.

On March 31, 1981, this order was confirmed by order to show cause. By consent of the parties, the order remains in effect as to Macmillan.

1. The Supreme Court has confirmed the jurisdiction of the federal courts to issue orders in support of prior proceedings repeatedly. For example, in *Local Loan Co. v. Hunt*, 292 U.S. 234, 239, 54 S.Ct. 695, 696, 78 L.Ed. 1230 (1934), the Court wrote

That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment decree rendered therein, is well settled. And this, irrespective of whether the court would have jurisdiction if the proceeding were an original one. The proceeding being ancillary and dependent, the jurisdiction of the court follows that of the original cause, and may be maintained without regard to the citizenship of the parties.

*See, also, Grimes v. Chrysler Motors Corp.*, 565 F.2d 841 (2d Cir. 1977). Where, as here, a court seeks to secure and preserve an earlier judgment, it makes not a jot of difference that certain individuals for example, Hendrickx and Imafina, are not parties. *See, e.g., American Safety Table Co. v. Schreiber & Goldberg, Inc.*, 320 F.Supp. 603 (S.D.N.Y.1970).

2. Clarkson, Imafina and Hendrickx are all "foreign" persons for diversity purposes.

While the Imafina transaction is cleverly—and curiously—constructed, I have little hesitancy, on the record before me, in concluding that the March, 1981 orders prohibit it as a transfer by Macmillan to Shaheen's nominee at Shaheen's instigation for the purpose of perpetuating Shaheen's control of Macmillan at a time when Shaheen faced the imminent loss of that control due to the operation of the earlier judgments. Not incidentally, the transaction would also sharply diminish the value of these heretofore control shares.

The court, of course, does not come to the Imafina transaction as an isolated incident. Faced with the loss of corporate control on earlier occasions, Shaheen has not hesitated to use fraudulent devices as a means of attempting to perpetuate control. *See Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506, 508 (2d Cir. 1981); *Clarkson Co. Ltd. v. Shaheen*, 533 F.Supp. 905, 917, 931 (S.D.N.Y.1982); *Clarkson Co. Ltd. v. Shaheen*, 525 F.Supp. 625, 630 (S.D.N.Y.1981).

Upon analysis of the testimony and documentary evidence received on the hearing, this transaction proves to be no different. For example, the price which Imafina agreed to pay for the stock was inadequate. Thus, the contract provided that Imafina would pay $1,800,000 in exchange for such number of "restricted" shares as would be set on the basis of a price thereafter to be fixed by an independent appraiser but in no event less than $2.75 or more than $4.50 per share. The contract also provided that Macmillan retained the right of first refusal in the event Imafina wished to sell its Macmillan shares and, beyond that, if Macmillan opted not to exercise its right to repurchase, Imafina was further prohibited from selling the stock elsewhere except in small lots. Of course, such numerous sales would ensure that the Imafina holdings would not be transferred as a controlling block.

In addition, it is clear that the investment banking firm that was hired to conduct the valuation—Neuberger & Berman—did so in a superficial fashion over the course of a single weekend, in mid-December 1981, with little in-depth study. At least one asset of substantial value had been omitted from the financial reports that the Neuberger firm was provided. Moreover, the firm was not furnished with the internal balance sheets for the months of October and November, 1981, and it disregarded without any inquiry or explanation certain insurance valuations which valued certain multimillion properties at almost triple the price they were carried on the Macmillan books.

This approach enabled Neuberger to fix the value of Macmillan shares at the low price of $2.87 per share which, in turn, would permit the transfer of the largest possible number of shares to Imafina for its fixed payment. Needless to say, had the transaction been consummated, the value of any outstanding shares of Macmillan would have diminished markedly, *i.e.*, from $5.45 to $4.00 per share.

William Kirschenbaum, the Director of Corporate Finance at Neuberger placed the transaction in perspective. He testified that the transaction with the restrictions on resale bore the earmarks of a "parking" operation, *i.e.*, a transaction where securities are "plac[ed] . . . in the hands of people who . . . are friendly" with incumbent management for the purpose of retaining incumbent management's control.

Other evidence confirms Hendrickx as an appropriate vehicle for a Shaheen "parking" operation. Hendrickx and Shaheen have known each other for years; they are long-time business associates. Shaheen, in fact, introduced Hendrickx to Macmillan. Moreover, in 1980, Hendrickx represented to Macmillan that the bank of which he was a vice president at the time had committed itself to lend $10 million to Macmillan for its use in a refinery project. That commitment never in fact existed.

Also significant is the fact that on December 9, 1981, Irving Galpeer, SEC counsel to Macmillan, forwarded a questionnaire to Hendrickx with respect to the Form 8–K he was preparing for the Imafina transaction. The questionnaire in essence asked Hendrickx to affirm that there was no relationship apart from that relationship established by the Imafina transaction between Hendrickx and Shaheen. The questionnaire

thus asked Hendrickx to put to rest any outstanding doubts about his business connections with Shaheen. The record shows no response on Hendrickx's part. Where presented with the opportunity to disclaim any such connection, Hendrickx failed to do so.

Moreover, Hendrickx not only did not appear before this court at the January, 1982 hearings, he did not even submit an affidavit substantiating his position. From this I draw the inference that Hendrickx had something to hide—namely, Shaheen's true purpose in this affair.

Still more facts demonstrate the violative nature of this transaction. Shaheen, for example, was in complete control of Macmillan and thereby was in position to orchestrate the transaction. In fact, it was Shaheen who first raised the idea of selling authorized but unissued shares as a way of raising funds; it was Shaheen who initially proposed the transaction to Hendrickx; and it was Shaheen who negotiated the transaction with him.

Macmillan, on the other hand, asserts that this transaction was solely to raise development money for a $100 million delayed coker. I do not credit this, for, if that were so, Macmillan could have raised much more money for less stock, even according to its own witness Kirschenbaum, by structuring a financing in any one of a number of different ways.

Finally, I am constrained to observe that this transaction was shrouded with secrecy throughout. Information as to its contemplation, existence, and implementation was withheld from Macmillan's litigation counsel even as he was regularly appearing before me on a number of other, related matters. Indeed, on December 14, 1981, with the transaction almost complete, Macmillan's litigation counsel still had no inkling of it even when specifically asked at a hearing late that afternoon if such a deal might be under contemplation. It was at the close of that afternoon's session that the Court specifically ordered that "Macmillan is to take no action that is to have the effect of diminishing the value of or diluting the voting power of the shares of Macmillan

stock which are or were owned by John M. Shaheen, Founders, SNR, or Macmillan."

The secrecy of the transaction was further demonstrated by the events which immediately followed the December 14 hearing. In order to complete the transaction, a final number of shares had to be issued and delivered by Chemical Bank, Macmillan's transfer agent. The exact number of those shares, of course, depended upon the price set by Neuberger & Berman and, as the contract provided, communicated to Macmillan *in writing*. It appears that Jesse Taub, vice president of finance at Macmillan, was informed of the issuance of the court order at approximately 6:30 on December 14—minutes after the Court's oral directi.... to the parties. Later that evening, Taub told another Macmillan lawyer, the one who was the author of the opinion letters to Chemical clearing the several issuance of stock, about the Court's directive. Nevertheless the final opinion letter, dated December 15, 1981 and authorizing the issuance of a number of shares based upon the telephonically communicated valuation of Neuberger & Berman, was delivered to Taub at 9:30 A.M. on the morning of December 15. Taub, then, in his own limousine, personally delivered the opinion letter to Chemical Bank and drove the Chemical representative to the Marine Midland Bank, the registrar, to expeditiously complete the transaction—something an executive rarely does, according to a Chemical Bank witness.

The said author of the opinion letter later testified before me that although the letter was dated and delivered to Taub on December 15, 1981, he had prepared it the prior day before learning of the court's injunction. He further testified that it had not occurred to him to recall the letter after learning of the court's order because, notwithstanding the fact that the letter speaks prospectively about "the Remaining Shares, *when issued* to Imafina, S. A.," he regarded the stock as *already issued*, with its delivery to Taub a mere ministerial act. A Chemical Bank officer, however, testified that stock is not issued until a certificate is delivered by the bank.

In any event, the evidence as to the circumstances attending the Decem-

ber 15 transaction proved so rank that Macmillan unilaterally rolled back the December 15 delivery without a ruling from the court.

I regard the calculated secrecy surrounding the entire Imafina transaction as the strongest evidence of both a deliberate effort to aid Shaheen and thereby injure Clarkson and an attempt to avoid the scrutiny of the court until a time when the transaction could be presented as a *fait accompli*.

Finding, as I do, that the Imafina transaction is in deliberate violation of this Court's orders of March 12 and 31, 1981, the requested preliminary injunction is granted; the Imafina transaction is hereby set aside in its entirety and Macmillan is directed to so notify its stock transfer agent and registrar to the end that the issued certificates are forthwith voided.

Submit order on notice.