The CLARKSON COMPANY LIMITED, as Trustee in Bankruptcy, appointed by the Supreme Court of the Province of Newfoundland, of the Property of Newfoundland Refining Company Limited and Provincial Refining Company Limited, Plaintiff,

v.

John M. SHAHEEN, Roy M. Furmark, Albin W. Smith, Peter L. Caras, Paul W. Rishell, Shaheen Natural Resources Company, Inc., Newfoundland Refining Company Ltd., U. S. A., and Founders Corporation, Defendants.

The CLARKSON COMPANY LIMITED, etc., Petitioner,

v.

FOUNDERS CORPORATION, Macmillan Ring-Free Oil Co., Inc., Shaheen Natural Resources Company, Inc., and John M. Shaheen, Respondents.

The CLARKSON COMPANY LIMITED, etc., Petitioner,

v.

SHAHEEN NATURAL RESOURCES COMPANY, INC., John M. Shaheen, Macmillan Ring-Free Oil Co., Inc., and Ian W. Outerbridge, Respondents.

The CLARKSON COMPANY LIMITED, etc., Petitioner,

v.

Martin RUBIN and John M. Shaheen, Respondents.

The CLARKSON COMPANY LIMITED, etc., Petitioner,

v.

John M. SHAHEEN, Brown Harris Stevens, Inc., and 642 Park Avenue Corp., Respondents,

and

Barbara T. Shaheen, Michael Shaheen, and Bradford Shaheen, Intervening Respondents.

No. 76 Civ. 1373.

United States District Court, S. D. New York.

Jan. 28, 1982.

White & Case, New York City, for plaintiff/petitioner The Clarkson Co. Ltd.; Jeffrey Barist, Allan L. Gropper, Edna R. Sussman, Kevin Ashley, New York City, of counsel.

Saxe, Bacon & Bolan, P. C., New York City, for defendants/respondents John M. Shaheen, Shaheen Natural Resources Co., Inc. and Founders Corp.; Thomas A. Andrews, Filip L. Tiffenberg, New York City, of counsel.

Trubin, Sillcocks, Edelman & Knapp, New York City, for respondent Macmillan Ring-Free Oil Co., Inc.; John Trubin, Roger R. Crane, Deirdre Kessler, New York City, of counsel.

Kornstein, Meister & Veisz, New York City, for respondent Martin Rubin; Ronald W. Meister, New York City, of counsel.

Patrick J. Rohan, Bronxville, N. Y., for intervenors Barbara Shaheen, Michael Shaheen and Bradford Shaheen.

Spengler, Carlson, Gubar, Brodsky & Rosenthal, New York City, for respondent Ian Outerbridge; Thomas H. Sear, J. Edward Meyer, III, Cynthia M. Brill, New York City, of counsel.

Netter, Dowd & Alfieri, New York City, for respondents Brown Harris Stevens, Inc. and 642 Park Avenue Corp.; Howard J. Adler, New York City, of counsel.

## OPINION AND ORDER

OWEN, District Judge.

This opinion addresses itself to various recent attempts by the Clarkson Company Limited ("Clarkson") to realize on a $50 million judgment awarded by a jury in this Court in July of 1980 against John M. Shaheen and certain of his various corporations, including Shaheen Natural Resources Co., Inc., ("SNR"), and Founders Corporation ("Founders"). That judgment essentially was founded on frauds of Shaheen and his corporate associates and has been affirmed on appeal. *The Clarkson Company Limited, etc. v. Shaheen, et al.*, 660 F.2d 506 (2d Cir. 1981). The assets sought in the instant proceedings are the following: 1) various stock owned by John M. Shaheen, which allegedly was pledged in 1977 to guarantee

the debts of several Shaheen corporations to another corporation which Shaheen controls and of which he is president and chief executive officer; 2) debts owed by one Shaheen corporation to Shaheen individually and to another of his corporations; 3) certain allegedly fraudulent conveyances among three Shaheen corporations; 4) Shaheen's half ownership of his Park Avenue cooperative apartment and 5) Shaheen's half ownership of his summer estate in Southampton, Long Island.[1]

I observe at the outset that Macmillan Ring-Free Oil Company, Inc. ("Macmillan"), SNR, and Founders, the three principal corporate actors in these supplementary proceedings, are affiliated corporations operating out of the same offices in New York City and are all elements of Shaheen's empire. The boards of directors of Macmillan, Founders, and SNR interlock extensively. Messrs. Peter Caras, Robert Collier, Milton Hibdon, Paul Rishell, Jesse Taub, Homer White, and Shaheen, all directors of Macmillan, are also directors of SNR. Messrs. Collier, Hibdon, Shaheen, and Taub, are four of the six directors of Founders. At all relevant times, Shaheen owned all of the shares of SNR and fifty-five percent of the shares of Founders. He also owned 1,421 shares of Macmillan common stock, which, combined with the substantial ownership of Macmillan stock by SNR and Founders, gave Shaheen control of more than forty percent of the outstanding Macmillan common stock.

In opposition to certain of Clarkson's instant turnover demands, Shaheen and his corporations assert various old and recent, allegedly bona fide transfers and pledges of all of these assets to others, which they claim place the assets beyond Clarkson's reach. Those are as follows: [2]

1. In April 1977 Shaheen placed all of his personal stock holdings in an escrow account, allegedly as a pledge to Macmillan;

2. Shaheen's right to $173,873 from Founders was allegedly pledged to Macmillan;

3. In October 1979 Shaheen transferred his interest in the Southampton estate to his wife;

4. Although in an 1980 affidavit Shaheen acknowledged half ownership of his New York City cooperative apartment, he later asserted, in response to Clarkson's turnover petition, that in 1965 he and his wife had in fact transferred the coop shares to their then-infant sons; and

5. Shaheen's claim on Founders for $360,420 to reimburse him for his liability to a third person, Harry Dean, was purportedly extinguished and turned into an obligation by Founders to pay Dean $75,000.

In response to other collection efforts by Clarkson before me, Shaheen and others assert that the "facts" defeat such efforts. Those are:

1) as to SNR's right to 23,517 shares of Macmillan preferred stock, issued as a stock dividend, worth $1,060,875, Macmillan claims to have seized this stock dividend as a setoff against SNR's unpaid debt to Macmillan, which Macmillan claims to be about $4 million;

2) as to three obligations of Founders to SNR aggregating more than $2 million, SNR and Founders claim that certain letters indefinitely extended the due

1. The extensive factual background of this action is set forth in *The Clarkson Company Limited, etc. v. Shaheen, et al.*, 660 F.2d 506 (2d Cir. 1981) and *The Clarkson Company Limited, etc. v. Shaheen, et al.*, 525 F.Supp. 625 (S.D.N.Y.1981).

2. I have already ruled on such a transfer. At the time of the judgment in this case, SNR owned 235,175 shares of common stock in Macmillan. In response to Clarkson's turnover proceeding, SNR revealed for the first time that, on July 31, 1980, *after* the judgment, it had turned over 185,723 of its shares of Macmillan common stock to Ian Outerbridge, a Canadian lawyer for Shaheen, and that Outerbridge had taken the shares out of the country. By opinion and order of October 27, 1981, *The Clarkson Company Limited, etc. v. Shaheen, et al.*, 525 F.Supp. 625 (S.D.N.Y.1981), I found this transfer to have been a fraudulent conveyance and granted Clarkson's motion for a turnover of the shares. The stock is now in the custody of the Court pending appeal.

dates of the loans if Founders was unable to pay at the time the loans otherwise came due;

3) as to a demand obligation to Shaheen, Founders and Shaheen claim that the statute of limitations bars the claim.[3]

THE RUBIN ESCROW

Turning first to Shaheen's alleged pledge of stock to guarantee the debts of his various companies to Macmillan, I find as follows:

After entry of judgment, Clarkson served information subpoenas on Shaheen in an effort to locate his assets. In response thereto Shaheen stated that he owned stock in various companies, but that the stock certificates were in the custody of one Martin Rubin, a New York lawyer, who was holding the stock as an escrowee. On about September 18, 1980, the Sheriff served an execution with notice of levy on Rubin with respect to that stock. The execution was not satisfied. Accordingly, on October 21, 1980, Clarkson petitioned for a turnover order, pursuant to Fed.R.Civ.P. 69(a) and C.P.L.R. § 5225(b) and (c), against Shaheen and Rubin directing that Shaheen's stock be turned over to Clarkson.

Shaheen answered the Rubin turnover petition on October 24, 1980, alleging that the stock had been pledged to Macmillan. On October 30, 1980, Rubin filed an interpleader complaint bringing Macmillan in as a potential claimant.

Macmillan thereafter answered and cross-claimed against Clarkson, alleging that Rubin was holding the stock as an escrow agent under an instrument dated March 29, 1977, pursuant to which the subject stock had been pledged by Shaheen in his individual capacity as collateral for loans made by Macmillan to various Shaheen corporations whose debts were guaranteed by Shaheen. Macmillan therefore claimed that it had a security interest in the stock "prior in time and senior to any interest of Clarkson and the Sheriff ...." Clarkson's answer to Macmillan's counterclaim denied any interest of Macmillan in the stock and alleged that any pledge to Macmillan by Shaheen was a fraudulent conveyance.

I find that the guaranty arose in the following manner. Over the years, Macmillan and the other Shaheen companies engaged in a continuous practice of paying each other's expenses. Ordinarily, they contend, accounts were settled at the close of each year. In 1975 and 1976, Macmillan made advances to and/or paid certain operating expenses of six Shaheen companies. These expenditures, totalling nearly $4.1 million and extending over two years, however, were not repaid by the end of 1976 because the Newfoundland Refining Company, the Shaheen company which had been providing the other companies with cash, went bankrupt, leaving the others unable to cover their debts to Macmillan.

Macmillan, a public company, was thus faced with having to disclose publicly that several separate corporations owned or controlled by Shaheen, Macmillan's president and controlling shareholder, owed at least

3. Perhaps anticipating skepticism on the part of the Court to the claim of a moratorium on payment of Founders' debts to Shaheen and SNR and the statute of limitations defense to Clarkson's attempt to garnish Founders's debt to Shaheen, Founders recently attempted to structure and assert a *third* defense to the garnishment of its debts. It appears that on November 30, 1981, Grace Gandert, a minority shareholder of Founders, and the widow of a defendant in the main action who died prior to trial, asked leave to intervene in the so-called Founders proceeding, allegedly to protect the interests of the company's shareholders. Mrs. Gandert contended that Founders' alleged debts to Shaheen and SNR were not debts at all, but were actually capital contributions by Shaheen to Founders. Thus, she argued, there existed no debt which Clarkson could garnish. Her intervention was denied for lack of standing. Founders thereupon represented to the Court that Founders itself had decided to assert Mrs. Gandert's position. Thus, although Founders had all along offered sworn testimony that the SNR and Shaheen payments to Founders were *loans* that were either 1) not yet due or 2) were time-barred, it suddenly contended that the loans were not loans at all, but were capital contributions. It even offered to the Court recent minutes of a meeting of the Board where this changed status of the transactions was belatedly recognized. Founders' motion to amend its pleading to assert this last-minute defense was, however, denied.

$4 million to Macmillan, which those companies could not pay. Because it did not want to make such a disclosure, Macmillan delayed filing with the Securities and Exchange Commission ("SEC") its annual report on Form 10–K and its quarterly reports on Form 10–Q for the fiscal quarters ending March 31, June 30, and September 30, 1976. Instead, in July of 1976, Phillip Gandert, a Macmillan director, wrote to the SEC that the delay was the result of problems with the intercompany receivables, stating that "the manner of liquidating that indebtedness to [Macmillan] has not yet been determined." By February, 1977, however, the SEC had become so impatient that it commenced an action against Macmillan to compel it to file its long-overdue financial statements.

Irving Galpeer, Esq., a former attorney on the staff of the SEC, was retained to deal with this problem. He advised the Macmillan directors that they might be personally liable for the unpaid advances. Galpeer recommended that Shaheen give a guaranty collateralized by his personal assets in an effort to prevent potential investigations and litigation involving Shaheen and Macmillan and, perhaps, the entire board of Macmillan. As Homer White, Macmillan's executive vice president and a board member directly involved in consideration of the guaranty at the time it was entered into, testified, the guaranty "had to be done because we couldn't go out and report to the public that we had taken no action." Shaheen himself agreed to enter into the proposed guaranty agreement only reluctantly; he testified that he did so only because of the fear of action by the SEC.

By the terms of the guaranty, John M. Shaheen as "Guarantor" guaranteed the debts of certain corporations to Macmillan. The guaranty provides:

"Guarantor hereby guarantees the Indebtedness owed by each Debtor to Macmillan totaling $4,086,206 as of December 31, 1976, as set forth on annexed Schedule A, together with any additional Indebtedness of such Debtors to Macmillan thereafter incurred."

Schedule A of the guaranty lists the "Debtors" and the amounts owing by them:

| Debtors | Amounts Due December 31, 1976 |
|---|---|
| Shaheen Natural Resources Co., Inc. | $2,054,656 |
| Newfoundland Refining Co., Limited | 114,943 |
| Founders Corporation | 26,212 |
| New York Press Publishing Co., Inc. | 1,530,351 |
| Provincial Refining Co., Limited | 28,113 |
| Syracuse T.V. | 331,931 |
| Total | $4,086,206 |

These debtors were all corporations controlled by Shaheen.[4] Shaheen owned 100 percent of SNR and, through it, 100 percent of New York Press, and he owned directly or indirectly at least a controlling share of the other corporate debtors.

The guaranty also provided:

> To further secure payment of the obligations herein referred to, Guarantor has deposited, pledged, given a security interest in and delivered to Macmillan the property set forth on annexed Schedule B, hereinafter called the "Collateral", to be held by the Escrowee as more fully set forth hereinafter.

The collateral was set forth on a Schedule B in a curious manner for a purportedly binding legal instrument memoralizing over $4,000,000 of assets supposedly pledged to Macmillan for its protection. The exact form of the said schedule—minus the red and blue inks—is as follows:[5]

4. Clarkson contends that the debts owed to Macmillan by Shaheen's companies were the obligations only of the companies, not of Shaheen personally and that, therefore, Shaheen's guarantee of the debts was a pledge without fair consideration. In view of my conclusions below, I need not determine whether the debts of the corporations Shaheen owned and/or controlled were antecedent obligations of John M. Shaheen for which he was personally liable.

5. Rubin holds an additional sixty-seven shares of Macmillan common stock and 142 shares of Macmillan preferred stock, all of which he received subsequent to the initial pledge. At trial, the parties stipulated that this stock constituted stock dividends earned by pledged stock and paid by Macmillan after the stock was delivered to Rubin. These additional shares are thus also part of the *res* in issue in this proceeding.

Schedule B

| | | | |
|---|---|---|---|
| 100% | 100 | shares | Shaheen Natural Resources Co. |
| 55.3% | 207,343 | shares | Founders Corporation |
| 35% | 896,047 | shares | CanAmera |

1304 shares Macmillan

(approx 10%) 30,000 shs SNR Holdings

(100%) 95 shs. Alberta Export

Assignment of monies owing by Founders Corporation

---

The guaranty was signed by Shaheen on March 29, 1979 and recited that the stock *already* had been deposited and delivered to Macmillan. The testimony of Macmillan attorney Galpeer, however, made it clear that this declaration in the guaranty was false, for nothing was given to Rubin until a month later. Macmillan's willingness to accept the guaranty, despite this false statement about a critical fact—the deposit of the pledged collateral—is further substantial evidence of the lack of seriousness with which the parties regarded the guaranty. In addition, approximately a month after the purported pledge, Shaheen, in an affidavit stated that his 100 shares of SNR, which were all the outstanding shares, was *not* pledged to anyone. Shaheen upon being confronted with this before me testified that at the time of the affidavit, he did not have the fact that he had just pledged his 100% ownership in SNR "in mind."

The conclusion is inescapable, therefore, that the guaranty was designed only to placate the SEC and enable Shaheen to remain president of Macmillan and to continue pursuing his various efforts to secure financing for not only Macmillan but also his other corporations. Indeed, Homer White, a Macmillan director, testified that, although the agreement was silent on this point, everyone involved understood that Macmillan would continue to finance Shaheen's operations.

Milton Hibdon, a director of both Macmillan and SNR and president and a director

of Founders, testified that it was the consistent goal of all the transfers challenged in these proceedings to keep control of Macmillan in Shaheen's hands. I credit Mr. Hibdon's testimony in this respect. Indeed, I find as a fact that, although the guaranty is made to appear to be for the benefit of Macmillan, it was intended to, and it did operate for the benefit of John M. Shaheen. I find it was not intended to, and did not make Macmillan any more secure as a creditor of the indebted companies. This latter finding is clear from the following.

Shaheen has been completely in control of Macmillan since at least 1974, directly and indirectly holding a controlling block of between forty-two percent and forty-seven percent of the common stock of Macmillan.[6] In addition to being the corporation's controlling shareholder, Shaheen has served as president and chief executive officer of Macmillan and has been a member of its board of directors from some time before 1977 until today. This has enabled him, as detailed below, to use the assets of Macmillan and all the related companies as he chose at any time regardless of pledges, escrows, public stockholders, or fellow directors.

Macmillan's Annual Report for 1979 explains Shaheen's relationship with Macmillan and describes the interlocking nature of the boards of Macmillan and other Shaheen companies. It states that Shaheen "may be deemed to be in control of the Company." Similar statements are found in the Macmillan annual reports for the years 1976, 1977, and 1978.

Of the ten directors who served on the board of Macmillan in early 1977, seven were also on the boards of other Shaheen companies, including SNR, Founders, and NRC. Macmillan identified only three of its eleven directors as "outside directors," Messrs. Collier, Thomas Chuhak and J. Raymond Bell. Of these three "outside directors," however, Collier clearly was under Shaheen's control, and Chuhak was heavily influenced by Shaheen. Indeed, Collier, the chairman of the Macmillan board, was a member of numerous other Shaheen company boards, including SNR and Founders. Moreover, Collier described himself at trial as "working for" Shaheen.

Thus it is beyond question that Shaheen controls Macmillan, that his control arose before March 29, 1977 (the date the guaranty was signed), and that his control of the company has continued to date.

Further evidence of this abounds. For example, as stated earlier, one result of the NRC bankruptcy was that NRC was no longer able to funnel cash to SNR. This made it difficult for SNR to pay Shaheen's salary. Accordingly, Shaheen testified, in 1976 Macmillan more than doubled his salary, raising it from $53,000 to $114,000. In his own words, ". . . I was deliberately bumped up [by Macmillan] because SNR was cramped." Macmillan essentially assumed an expense of another Shaheen company for no reason other than the other company's. inability to pay. Macmillan again raised Shaheen's salary in March, 1980, from $114,000 to $164,000 per year, retroactive to July 1979. The purpose of this was to enable Shaheen to liquidate an outstanding "debt" for unsubstantiated expenses which Macmillan had earlier paid for him. Had Macmillan not engineered this so-called repayment to itself by raising Shaheen's salary by $50,000, it would have had to disclose the payment of the unsupported expenses in its financial statement.

Evidence of Shaheen's control of Macmillan can also be found in Macmillan's willingness to fund Shaheen's continuing business activities for other corporations, an activity which, arguably, amounts to corporate waste. For example, at the close of 1975, Shaheen companies owed Macmillan $1,399,421. Despite the fact that this sum was not paid up at year's end, as had been the prior practice of the parties, Macmillan

6. SNR, one-hundred-percent of which is owned by Shaheen, owns approximately thirteen and a half percent of Macmillan common. Founders, fifty-five-percent of which is owned by Shaheen, owns more than twenty-eight percent of Macmillan. Shaheen individually owns 1,421 shares of Macmillan common.

advanced an additional $2.6 million in 1976 and $368,000 in 1977.

Macmillan admitted in its 1979 Annual Report that it continued to advance hundreds of thousands of dollars for Shaheen's other companies in 1977, 1978, and 1979. That report states,

> during the years 1977 and 1978, the Company [Macmillan] paid approximately $300,000 and $465,000, respectively, to cover the cost of certain travel expenses for Shaheen and others and to cover various consulting fees. In addition, officers and employees of the Company performed services for and used the premises and facilities of the Company for related companies of Shaheen. The value of such services and use, estimated at the rate of approximately $350,000 per year, has not been allocated to such companies .... The travel expenses and consulting fees approximated $351,000 from January 1 through September 29, 1979 .... The services of officers and employees and use of premises has continued and is continuing .... at the rate of approximately $350,000 per annum.

It is undisputed that this sum of $1,050,000 spent in 1977, 1978 and 1979, and the continuing expenditures in 1980 were not for Macmillan functions, and were not even treated on Macmillan's books as advances to Shaheen's various companies.

Coopers & Lybrand, the public accounting firm, reviewed the expenditures for Shaheen's and others' travel expenses and consulting fees which aggregated about $1,116,000 for 1977 through 1979 and determined that a large percentage of those amounts "related directly to Mr. Shaheen's efforts to secure financing for *non-Macmillan* ventures." (emphasis supplied). Of the $1.1 million paid to cover Shaheen's expenses in 1977, 1978, and 1979, Coopers and Lybrand found that *75%* could *not* be shown to benefit Macmillan in any way and that, therefore, they could not be recognized as deductible expenses from Macmillan's income.

Macmillan nonetheless continued to pay expenditures for travel expenses after September 1979 in connection with Shaheen's other ventures. Macmillan attempted to explain to the Court that the expenditures for Shaheen's non-Macmillan activities were "necessary and advisable" to protect the value of the Shaheen collateral and to enable the debtor companies to repay their debts to Macmillan. I do not credit this. It seems hardly advisable for a company with an aggregate net income for 1977, 1978 and 1979 of some $6 million to spend close to $2 million to protect repayment of some $4 million from insolvent affiliates. Moreover, in light of the affiliates' desperate financial condition, these expenditures of $2 million for their benefit was no more than a gamble that Shaheen, in the words of Macmillan's attorney Galpeer, could try to "pull a rabbit out of the hat ...."

Macmillan contends further that the expenditures were necessary to obtain financing for Macmillan's proposed West Coast refinery because Macmillan could obtain its financing only as part of a greater package which might be negotiated by John M. Shaheen. Valtec Associates, however, the consulting firm which the Macmillan Board retained for advice about the Company's relationship with Shaheen, saw no link between the financing of the proposed Macmillan refinery and Shaheen's other ventures. Indeed, Valtec expressed concern that Shaheen would succeed in obtaining financing only for his own projects and none for the refinery. Similarly, Hibdon testified that the efforts to obtain financing for the refinery and for Shaheen's other projects were entirely independent. The lack of serious value to Macmillan of Shaheen's activities may also be revealed by the fact that despite Macmillan's expenditure of nearly $2,000,000, or roughly 30% of its net income for 1977–1979, to support Shaheen's efforts to secure such financing, as of the date of trial, Collier, the chairman of the Macmillan board, did not even know whether Macmillan had obtained any commitments. Shaheen, himself, in describing his efforts to secure $280 million in financing for Macmillan, a company with a book value of only $10 million, blithely testified

that if he were successful, he would have accomplished an "act of levitation" and "a feat somewhat superior to anything Houdini ever achieved." [7]

It is clear, furthermore, from the minutes of the Macmillan board meetings that the board was prepared to advance Shaheen substantial expense money whenever he asked for it and on the apparently unsupported representation by Shaheen that although "nothing tangible" had come of his efforts to secure financing for Macmillan's proposed refinery, those efforts "seem[ed] to have a chance of coming through."

I find, therefore, that Macmillan's continued willingness to fund Shaheen's activities and its implausible explanations therefor serve clearly to demonstrate Shaheen's control and domination of the Macmillan board and corporate conduct.

Interestingly, Macmillan's contention that its retention of Valtec was proof that Shaheen did not control the board, on closer examination demonstrates the contrary. Valtec's report on the debt was based on no independent investigation. Rather, Valtec merely interviewed Shaheen, his lawyer, and some company personnel and reviewed company documents. And even given the limited nature of this so-called investigation, Valtec nevertheless advised Macmillan to seize the collateral in Rubin's escrow pursuant to the guaranty unless Shaheen corrected the delinquencies within six months, i.e., by the end of September 1979. Shaheen's corporations did not pay by that date, yet Macmillan ignored this advice and made no effort to foreclose on Shaheen's assets to satisfy the debt.

Valtec was not the only Macmillan advisor to recommend that Macmillan declare Shaheen to be in default. In February 1980, Irving Galpeer, Macmillan's outside counsel for SEC matters, "strongly urged" the Macmillan board to give notice of default so that the company could terminate the escrow and apply the stock against the unpaid debt. The board rejected Galpeer's advice so that Shaheen could continue his activities. I note further in this connection that Galpeer testified that on more than one occasion Shaheen told the board that taking any action under the guaranty would harm his reputation, thereby impairing his ability to raise funds. In other words Shaheen informed the board of directors of the corporation of which he was president and controlling shareholder, that he opposed taking any action to enforce the guaranty agreement which he himself had made for the corporation's benefit. This advice to the board, quite obviously, was a directive that Macmillan act as though the guaranty never had been executed.[8]

In response to their president's "suggestion" that they not take any action that he thought would be injurious to his personal interests, the Macmillan board members in fact *took no action.* Macmillan, of course, *had* to act in order for Shaheen to be in default under the guaranty agreement and for Macmillan to be able to seize the escrowed stock and apply it against the unpaid debt. Specifically, Macmillan had to notify Shaheen in writing that he was in breach of the agreement. Default then occurred only if Shaheen failed to cure within thirty days.[9]

In fact, Shaheen had been in default on his obligations to make or cause to be made semi-annual payments under the guaranty since March 29, 1978. Yet, despite the advice of Galpeer and Valtec, the Macmillan board did not take the first step to enforce its "rights" under the guaranty agreement until September 30, 1980, two and one half months after the entry of Clarkson's multi-

7. To date, Shaheen has obtained no written commitment for financing the West Coast refinery or any other venture.

8. The Board also deferred to Shaheen on decisions concerning his companies whose stock was pledged under the Guaranty. For example, White said he looked to Shaheen for approval of certain action in connection with the sale of some oil leases owned by Can-Amera Export Refining Company, Ltd., because Shaheen was the chief executive of Macmillan.

9. This "protective" mechanism, according to Galpeer, had been carefully negotiated over thirty days and written into the agreement in order to protect Shaheen.

million dollar judgment against Shaheen and SNR and *eleven days after Clarkson attempted to levy on the shares* which were the *res* of the putative escrow. Indeed, as both Galpeer and Collier testified, the only reason Macmillan declared a default even on that late date, after two and a half years of delinquency by Shaheen, was that Clarkson had obtained its judgment.

On the whole, it could fairly and accurately be said, and I find as a fact, that Shaheen knew of and was in control of all decisions made by the Macmillan board, including decisions about what actions to take or not to take with respect to his own guaranty.

He has not only at all times maintained complete control over the collateral he supposedly pledged, but he has continued to date to have absolute dominion over the companies and the assets of the companies whose stock was supposedly pledged as security for the delinquent debts. In this regard it is significant that members of the board recognized in testimony before me the necessity of restricting Shaheen's control of the companies whose stock was pledged and his freedom to use and dispose of those companies' assets. Yet, absolutely no such restriction was either written into the Guaranty agreement or even suggested at a board meeting. The testimony is clear that the board never considered including in the agreement a provision such as a voting trust or a covenant against the transfer of assets to protect Macmillan's interest in those assets. The absence of such protective clauses is all the more striking in light of attorney Galpeer's testimony that the agreement was the product of careful negotiations over a period of a month and the fact that the agreement did contain important features for Shaheen's protection. *See* note 9, *supra.*

While certain of Macmillan's directors testified that Shaheen promised orally to use the assets of the companies only in the ordinary course of business, it is clear that this promise, even if it were made—and I find that it was not—was of no effect, for Shaheen, in one glaring incident, unrestrained by any pledge agreement, transferred to a Canadian lawyer without consideration and without informing Macmillan, most of the principal asset of SNR, one hundred percent of whose stock he had pledged to Macmillan. *See* note 2, *supra.* Indeed, Shaheen testified that, although the stock in question was SNR's "last bucket of stock," he felt he was under no obligation—because he was under no obligation—to seek the permission of or inform his fellow officers and directors before acting to cause the SNR stock in the alleged escrow account to become virtually worthless.

In addition to the obvious control he enjoyed over the assets of the pledged companies, it is undisputed that Shaheen also continued to control the companies themselves. Altogether unimpeded by the guaranty, he continued to vote the shares and manage the various corporations.

On September 30, 1980, after Shaheen had been in breach of the guaranty agreement for two and a half years, Macmillan finally sent a notice of noncompliance to Shaheen stating that "payments required under the Guaranty have not been made" and that failure to cure within 30 days would result in a "default" under the guaranty. This was, as noted earlier, two and a half months after the entry of judgment against Shaheen, and just eleven days after Clarkson attempted to levy on the shares. Then, on November 13, 1980, Macmillan finally declared a default and asserted its right to possession of the collateral.

At trial, Macmillan claimed that it refrained from foreclosing on the pledged collateral both because it wanted to protect Shaheen's reputation in the financial community and, as it argued in its post-trial brief, because it was *unaware* of the enormous personal liability Shaheen faced in the Clarkson lawsuit. The second contention, I find, is absurd and contradicted by the evidence.[10] I credit, however, the testimony

**10.** Macmillan states that the entry of judgment against Shaheen and SNR on July 22, 1980, suddenly revealed to it the magnitude of Shaheen's liability and that at that point it conclud-

that Macmillan refrained from foreclosing to protect Shaheen. Undoubtedly, this, combined with the desire to avoid public disclosure of the financial machinations at Macmillan, is so. I conclude that the primary reason for deferring the foreclosure was that Shaheen did not want it to occur until it became a question of losing the *res* to Clarkson, at which point he chose to keep it for Macmillan and thus for himself.

Shaheen's own counsel on these hearings—not Macmillan's—revealed Shaheen's motivation in attempting to explain Macmillan's rationale for declaring a default after Clarkson's levy by stating that Shaheen had a "[personal] preference and intention that the stock go to Macmillan ... rather than [to] Clarkson." Obviously, Shaheen's personal preference would have been irrelevant were the pledge a *valid* pledge, rather than a sham which left him in complete control of the collateral. Faced with the choice between Clarkson and Macmillan taking title to his various corporations, Shaheen utilized the alleged pledge to turn the stock over to Macmillan, where he, Shaheen, was in control.[11]

In sum, I find that Shaheen controlled Macmillan from before the time of the alleged pledge, through the declaration of default, to this very day; that Shaheen at all times controlled the companies and the assets of the companies whose stock was supposedly pledged; and that he controlled the decision of whether and when to call the "pledge." In short, I find that neither Shaheen nor Macmillan ever intended that a valid pledge be created and that, in fact, none was.

I turn now to the legal effect of the foregoing facts. I conclude that, whether viewed from the perspective of Macmillan or that of Shaheen, the alleged pledge conveyed no security interest in the *res* of the escrow. Viewed from the perspective of the pledgee, Macmillan's possession was, in fact, Shaheen's possession. Viewed from the perspective of the pledgor, the fact that Shaheen was permitted to and did exercise full control and dominion over the assets and the companies represented by the pledged certificates rendered ineffective the purported agreement to pledge the stock, thereby precluding the creation of a security interest.

Corporate securities are "instruments" under the definitions contained in §§ 8–102(1)(a) and 9–105(1)(g) (now 9–105(1)(i)) of the Uniform Commercial Code (the "UCC"). Section 9–304(1) of the UCC provides that a security interest in a corporate security arises *only* when the party to be secured takes *possession* of the instrument or instruments. The UCC enlarges the conventional meaning of possession to include possession by an agent acting on behalf of the party to be secured. Thus, viewed in strict isolation, the fact that the stock was delivered to an escrowee, Martin Rubin—whom I conclude was independent of John M. Shaheen—rather than to Macmillan directly, would be the equivalent of Macmillan's perfection by possession of a security interest in the stock. There is no question that an escrow agent *may* serve as the secured party's agent in possession of the instruments, so long as the agent is not controlled by the debtor. *In the Matter of Copeland*, 531 F.2d 1195, 1204 (3d Cir. 1976).

Where a security interest can arise *only* by the pledgee's possession, however, that possession must be such as to prevent the debtor from having control of or access

ed that Shaheen was "extremely unlikely" to pay or cause to be paid any of the debt he had guaranteed. For this reason, Macmillan contends, it finally declared a default under the guaranty and moved against the pledged stock. Yet, one notes, not even this spurred Macmillan to foreclose immediately. It was not until *three months after the jury's verdict* that Macmillan first set the wheels in motion by notifying Shaheen of his non-compliance. It is obvious that the event that triggered the "foreclosure" by Macmillan was neither the jury's verdict nor the entry of judgment. Rather, it was Clarkson's levy on September 19, 1980 on the pledged stock that caused Macmillan to move eleven days later.

11. The fact that Macmillan has public shareholders does not affect the result here. Those shareholders have had no control over Macmillan. The only effect of their existence has been to create a concern for cosmetics.

to the *res* of the pledge. Thus, even assuming that, contrary to the facts here, Macmillan was truly in possession of the pledged stock by virtue of the Rubin escrow, if Shaheen were permitted to control the collateral, the security interest would be destroyed. As official Comment 6 of § 9–205 explains:

> the holder of an unfiled security interest, whose perfection depends on possession of the collateral by the secured party or by a bailee ..., can[not] allow the debtor access to and control over the goods *without thereby losing his perfected interest.* The common law rules on the degree and extent of possession which are necessary to perfect a pledge interest ... are not relaxed by this or any other section of this Article. (Emphasis supplied).

The Historical Note to the New York Annotations to UCC § 9–205 explains further that "where the security interest is perfected by filing, the secured party may allow the debtor to use, commingle, or dispose of collateral without invalidating the security interest .... *But in a pledge ..., similar freedom would negate the requisite actual and exclusive possession of the secured party or bailee.*" (Emphasis supplied.) Law Revision Commission, 1956 Recommendations, at 269–70.

■ The foregoing makes it clear that unless a putative secured party's possession of pledged instruments rises to the level of "actual and exclusive possession" as required at common law, his security interest has not been perfected. The law has two requirements in this regard. First, "the pledgor [must] surrender his dominion over the property, and ... [second] any semblance of ostensible ownership in the pledgor [must] be negatived." 4B Collier, *Bankruptcy*, ¶ 70.86 at 982 (14th ed. 1978). This circuit has recognized and adopted these requirements. *Gins v. Mauser Plumbing Supply Co., Inc.*, 148 F.2d 974 (2d Cir. 1945); *Sammet v. Mayer*, 108 F.2d 337 (2d Cir. 1939); *In re Merz*, 37 F.2d 1 (2d Cir.), *cert. denied*, 281 U.S. 738, 50 S.Ct. 333, 74 L.Ed. 1152 (1930).

■ Macmillan's contention that the requirements for the perfection of its security interest were satisfied by the mere delivery of the stock to Rubin, the escrowee, must fall in the face of the totality of the surrounding facts as I have found them. The alleged pledge was a sham. It was never intended to give Macmillan any rights in the collateral, and it was pressed into service only as a last resort to maintain Shaheen's control over his assets by keeping them in the hands of Macmillan, which Shaheen controlled. Shaheen not only never relinquished his dominion over the collateral herein; he exercised that dominion whenever he saw fit, and, thus, at all times was both the ostensible and actual owner of the stock he had supposedly pledged under the Guaranty.

Given the foregoing, I conclude as a matter of law that Macmillan never took possession of Shaheen's stock within the meaning of § 9–304(1) of the UCC and, consequently, never perfected its alleged security interest in the stock held by Martin Rubin.[12] There was, therefore, no valid pledge.

■ Clarkson, therefore, is entitled to a judgment directing Martin Rubin to deliver to the Sheriff of the City of New York, New York County Division, for the benefit of Clarkson, all property in his possession or control as escrow agent herein.[13]

It is appropriate at this point to consider stakeholder Martin Rubin's proposed order discharging him from the proceedings and awarding him costs and attorneys' fees.

12. I reject Macmillan's suggestion that disclosure of the pledge in SEC filings may alone be adequate to perfect its security interest in the collateral. This contention ignores the express language of the UCC, which requires *possession* to perfect a security interest in securities.

13. The hand-written notation, apparently by Shaheen, on Schedule B of the guaranty, *see* p. 912 *supra*, purported to include in the alleged pledge "monies owing by Founders" to Shaheen. Having concluded that no real pledge existed, I need not determine as a matter of law whether this scrawl, whenever made, suffices to pledge or assign the debt owed Shaheen. Note the further consideration of this debt, at p. 931 *infra*.

His motion seeking this relief was granted on December 22, 1980. All parties have responded to the proposed order by written submissions to the Court.

As outlined earlier, in 1977, Rubin agreed to serve as escrowee in possession of the stock supposedly pledged by Shaheen to Macmillan to guarantee the intercompany debt. Rubin performed his duties professionally and in good faith. He was not aware that the pledge agreement executed by Shaheen for Macmillan's benefit was, as I found above, a sham. Rubin has no interest in the *res* he holds, beyond his interest in recovering his costs and attorneys' fees, and he has no personal stake in the outcome of the dispute.

On September 19, 1980, Clarkson caused the sheriff to attempt to levy on the shares by serving a copy of an execution on Rubin. Macmillan sought to protect its claim to the property by bringing suit against Clarkson, Rubin, Shaheen, and the sheriff in state court. Fearing the possibility of inconsistent judgments in state and federal court, Rubin commenced this federal interpleader action on October 31, 1980, naming the sheriff and Macmillan as additional claimants of the *res*, and sought and obtained an injunction against Macmillan's state court action.

During the course of this proceeding, Rubin, by counsel, has been obliged to answer Clarkson's turnover petition and order to show cause, prepare and file an interpleader complaint, reply to Macmillan's counterclaim, prepare and obtain an order to show cause why Macmillan's state action should not be stayed, secure an injunction staying that action, participate in discovery and pre-trial conferences, appear in the Court of Appeals upon Shaheen's unsuccessful petition for mandamus, prepare for trial, and appear at many court sessions. I find Rubin's request for $10,000 in attorneys' fees for 110 hours at $90.00 per hour, to be reasonable and necessary in the circumstances of this case.

The Court has wide discretion to award costs and attorneys' fees, when such an award would be fair and equitable, to the stakeholder who commences an interpleader action. *E.g., A/S Krediit Pank v. Chase Manhattan Bank*, 303 F.2d 648 (2d Cir. 1962). This discretion is properly invoked when, as here, the stakeholder has acted in good faith, has claimed no interest in the *res*, and has acted to promote the resolution of the dispute as to entitlement to the property he holds. 3A J. Moore, *Federal Practice* § 22,16[2] (2d ed. 1981); 7 Wright and Miller, *Federal Practice and Procedure* § 1719. Accordingly, Rubin is hereby awarded his costs in this action, and reasonable attorneys' fees and disbursements in the amount of $10,000.

In view of the circumstances of this proceeding, however, the award to Rubin is not to be charged against the stake he holds. Rather, the award is to be borne jointly and severally by Macmillan Ring-Free Oil Co., Inc. and John M. Shaheen. The conduct of Macmillan and Shaheen, first involving Rubin in the sham pledge, and second, generally prolonging and complicating his involvement in the case, combined with the fact that the guaranty agreement provides that "all fees and expenses of Escrowee shall be shared equally by Macmillan and [Shaheen]," compels the conclusion that they, not the *res* to which I have held they are not entitled, should bear the costs incurred by Rubin. *See Schirmer Stevedoring Co. Ltd. v. Seaboard Stevedoring Corp.*, 306 F.2d 188 (9th Cir. 1962) (*dictum*); *Brisacher v. Tracy-Collins Trust Co.*, 277 F.2d 519 (10th Cir. 1960).

Accordingly, Macmillan and/or Shaheen are directed to pay Rubin the foregoing costs and attorneys' fees within thirty days of the date hereof, less $500 already paid by Macmillan as a retainer.

## SHAHEEN'S COOPERATIVE APARTMENT

Next, I turn to Clarkson's petition for an order requiring Shaheen to turn over for Clarkson's benefit his alleged interest in a cooperative apartment in New York City. In post-judgment answers to Clarkson's information subpoena dated October 20, 1980,

Shaheen stated under oath that he owned an interest in the cooperative apartment in which he lived at 640 Park Avenue, and that legal and equitable title to the apartment was in the name of John M. and Barbara T. Shaheen. Clarkson, by petition dated October 17, 1980, had just sought an order, pursuant to Fed.R.Civ.P. 60(a) and CPLR § 5225(a) and (c), requiring Shaheen to deliver to it that very interest.

However, in his subsequent answer to the petition and affidavit in opposition to the motion Shaheen suddenly changed position, and stated for the first time that his previous answer to the information subpoena was incorrect and that on July 26, 1965,—fifteen years earlier—Shaheen and his wife had in fact conveyed the apartment to their then-infant sons, Michael and Bradford Shaheen and that he, Shaheen, has had *no* proprietary interest in the coop since then. In March, 1981, Barbara Shaheen and Bradford Shaheen were granted leave to intervene as respondents.

The facts are as follows. John and Barbara Shaheen bought the cooperative apartment in August 1960 and entered into a proprietary lease with 642 Park Avenue Corporation. The certificate of stock of 642 Park Avenue Corporation was issued to John M. Shaheen and Barbara T. Shaheen on August 4, 1960, and was then placed in a locked strong box in a file cabinet in the SNR office and more particularly, in the office of Mr. Shaheen's executive secretary. The secretary was an employee of SNR and had the only key to the strong box. On July 26, 1965, the certificate may have been removed from the strong box, the form "assignment" on the back filled out by Mr. Shaheen and signed by John and Barbara Shaheen at Mr. Shaheen's office, and the certificate returned to the strong box. The donees, Michael and Bradford, were then thirteen and ten years old, respectively.

By their own testimony, even assuming their signing of the certificate, John and Barbara Shaheen did nothing further to complete the gift. Neither recalls ever having told Michael or Bradford that they had given the boys the cooperative apartment. Bradford testified that he first learned that the shares had been transferred to him in the latter part of 1980 and that other than some vague references, his parents never told him directly that he owned the shares.

The proprietary lease severely restricts the alienability of the coop shares by requiring the following:

1) The assignee of the lease (and transferee of the shares) must execute as part of the assignment a covenant to perform and comply with all obligations of the lease and deliver the assignment to the coop corporation (the "lessor").

2) The accompanying stock must be transferred to the assignee.

3) The legal expenses of the lessor and any sums due from the assignor must be paid to the lessor.

4) The assignment must be approved in writing by the board of directors of the coop corporation or by shareholders holding two-thirds of the corporation's capital stock, and the writing must be delivered to the lessor.

Not only did the Shaheens fail to comply with these clearly articulated prerequisites to transfer, but they also did not inform the board of directors of the corporation that they had endorsed the coop stock certificates. Significantly, the Shaheens executed, in their own names, a renewal of the proprietary lease on August 8, 1966, just twelve and a half months *after* they allegedly transferred the coop to their sons. John and Barbara Shaheen have lived in the coop continuously since 1960; both Bradford and Michael moved out some years ago. In addition, neither Barbara nor John Shaheen reported to any taxing authority any gift of the coop stock certificate to Bradford or Michael.

Mabel Geiger, Shaheen's current executive secretary, testified that for at least five years there has been nothing in the box except Shaheen's possessions. The box, of course, contained the coop stock certificate. Prior to that time, certain shares of stock of other corporations held under the endorsed title "John Shaheen, custodian under the Uniform Gift to Minors Act, . . ." for Brad-

ford and Michael Shaheen, which had been kept in the box, were removed to be held by a bank custodian on behalf of the sons. The coop certificate was never removed.

John Shaheen has paid for the maintenance of the 640 Park Avenue coop apartment since at least 1967. Bradford Shaheen stated that he never made a maintenance payment to Brown Harris Stevens, Inc., the managing agent. Ms. Geiger testified that she attended to the payment of the maintenance of the coop and that since 1967 John Shaheen had paid all of the maintenance. In his 1976 federal income tax return, John Shaheen claimed a deduction for interest payments to Brown Harris. While there was testimony that funds of Bradford and Michael Shaheen were, in recent years, the source of some payments by Shaheen of the maintenance charges on the apartment, Ms. Geiger testified that these monies were loans from Bradford and Michael to their father, not gifts, and that some of the money lent was used for other purposes.

On at least three recent occasions, Shaheen has described himself as the owner of the apartment. At a meeting of the board of directors of Macmillan on March 10, 1977, Shaheen told the board that he and his wife jointly owned a cooperative apartment in New York City.[14] More recently, in answering Clarkson's October 1980 information subpoena, Shaheen swore that he and his wife owned the apartment. Finally, in an attempt to use the apartment as collateral for a bank loan, Shaheen stated he owned the apartment. Shaheen now contends that these claims of ownership were "pure errors."

Under New York law, the burden of proving the existence of a valid *inter vivos* gift is on the party asserting that the gift was made. *First National Bank of Lockhaven v. FitzPatrick*, 29 A.D.2d 450, 289 N.Y.S.2d 314, 320 (4th Dep't 1968), *aff'd*, 26 N.Y.2d 792, 309 N.Y.S.2d 219, 257 N.E.2d 663 (1970). That proof must be by a fair preponderance of the clear and convincing evidence. *Id.* The elements of a gift which must be established under the above standard are (1) intent of the donor to give the gift, (2) delivery of the property intended to be given, and (3) acceptance of the property by the donee. *In re Estate of Szabo*, 10 N.Y.2d 94, 217 N.Y.S.2d 593, 176 N.E.2d 395 (1961). I focus only on the elements of intent and delivery, because, I conclude, the Shaheens and their sons have failed to prove either.

Turning first to the element of intent to make the gift, I find that there was no intent on the part of Mr. and Mrs. Shaheen to make a gift to their sons. At most, it appears that the certificate may have been written upon, endorsing it to Michael and Bradford on July 26, 1965. With the exception of this piece of evidence, however, the overwhelming weight of the objective evidence recited above demonstrates continuing ownership in John and Barbara Shaheen. Thus, one cannot but conclude that John, Barbara, Michael, and Bradford Shaheen have utterly failed to sustain their burden of proving that the parents intended to give their two sons the apartment at any relevant time.

In addition, I conclude that the four Shaheens also have utterly failed to sustain their burden of proving the delivery required to make a valid *inter vivos* gift. The certificate was never out of the possession and control of John Shaheen. At any time, Mr. Shaheen could have crossed out the endorsement to his sons; the transfer was not registered and he possessed the certificate.

Delivery of property which the owner intends to give

> must be such as to vest the donee with control and dominion over the property.... "The delivery necessary to consummate a gift must be as perfect as the nature of the property and the circum-

14. This representation by Shaheen as to his ownership was reaffirmed at the meeting of the Board of the following week on March 17. At that meeting, the board elected not to seek a security interest in the cooperative apartment, which Irving Galpeer described, in Shaheen's presence, as jointly owned by Shaheen and his wife.

stances and surroundings of the parties will reasonably permit; there must be a change of dominion and ownership; intention or mere words cannot supply the place of an actual surrender of control and authority over the thing intended to be given." (citation omitted).

*In re Estate of Szabo, supra,* 10 N.Y.2d at 98, 217 N.Y.S.2d at 595, 176 N.E.2d at 396.

Because neither the requisite intent nor delivery has been proven in this case, I conclude that the allegation of a gift of the apartment fails. Accordingly, John M. Shaheen's interest in the coop shares was and is unaffected by the endorsement on the back of the certificate.

Any other result would sanction an arrangement by which Mr. Shaheen could suddenly reveal the purported assignment at such time as creditors asserted claims against the property, but could, otherwise, for the entire sixteen years, enjoy the benefits of unfettered ownership, including living in the apartment and attempting to use the shares as collateral for a personal loan.[15] Such an arrangement is inherently fraudulent, *see Takacs v. Kapela,* 264 A.D. 871, 35 N.Y.S.2d 502 (2d Dep't 1942), and must be set aside as a transfer effected with the intent to defraud creditors. N.Y.Debt. & Cred.Law § 276 (McKinney).

Mrs. Shaheen and her sons contend that even if the gift of the shares fails to survive the Court's judicial scrutiny, Clarkson still may not look to John Shaheen's interest to satisfy its judgment against him because of the nature of the Shaheen's ownership of the shares. I reject this argument. John and Barbara Shaheen own the shares as tenants in common. A tenant in common may sell or assign his or her interest in a tenancy in common without the consent of the other tenant or tenants in common, *Warren v. Hoch,* 276 A.D. 607, 96 N.Y.S.2d 832 (2d Dep't), *app. denied,* 277 A.D. 879, 98 N.Y.S.2d 220 (2d Dep't 1950), and, logically, a judgment creditor of one tenant in common may levy on that tenant's interest in order to satisfy the judgment. *E.g., Hohenrath v. Wallach,* 37 A.D.2d 248, 323 N.Y.S.2d 560, 562 (2d Dep't 1971), *appeal dismissed,* 30 N.Y.2d 674, 332 N.Y.S.2d 106, 282 N.E.2d 891 (1972). The purchaser at execution sale of Shaheen's interest in the coop shares would become, by operation of law, a tenant in common with Mrs. Shaheen. *Id.* Such new tenant could institute an action in equity for partition of the interests. *See Levine v. Carr,* 33 Misc.2d 425, 215 N.Y.S.2d 402, (Sup.Ct.Nassau Co. 1961). Thus, the form of the Shaheens' ownership of the shares does not prevent this Court from ordering the sale of John Shaheen's interest in the apartment for the benefit of Clarkson. The remaining defenses asserted by Mrs. Shaheen and her two sons are so devoid of merit as not to require discussion.

Accordingly, Shaheen is directed to deliver to or for the benefit of Clarkson, all his right, title, and interest in the cooperative apartment in which he resides at 640 Park Avenue, New York, New York and to execute and deliver all documents necessary to effect such delivery. Shaheen's motion to amend his earlier sworn answers to certain questions in Clarkson's information subpoena, in which he admitted ownership, in order now to deny ownership of the coop is denied. In view of the overwhelming objective evidence recited above, such a motion is an affront to the Court.

## SHAHEEN'S ESTATE IN SOUTHAMPTON, LONG ISLAND

I turn next to Clarkson's petition concerning Shaheen's alleged interest in an estate in Southampton, Long Island, called "Old Trees." Until at least October 1, 1979, Shaheen owned "Old Trees" with his wife as tenants by the entirety. The estate consists of ten acres on eastern Long Island with a large main house, a garage, a separate, single-family house, and a cottage.

15. One cannot help but observe the parallel between this transaction and the putative guaranty in the Rubin proceeding. In both cases, Shaheen claims to have alienated his interest in some way, but in each instance he in fact retained the property and exercised full ownership and control over it.

The property contains or fronts on a lake. The Shaheens use the main house primarily in the summers; Mrs. Shaheen spends much of her time between Memorial Day and October there, and Mr. Shaheen commutes between Southampton and Manhattan on weekends while his wife is in residence on Long Island.

In his answers to Clarkson's information subpoena, sworn to on October 20, 1980, Shaheen stated that a year before, on October 1, 1979, he gave his one-half interest in the estate to his wife as a gift. Subsequently, on March 17, 1981, Clarkson filed an amended petition seeking an order pursuant to CPLR § 5225 annulling this alleged conveyance and directing that Shaheen's interest in "Old Trees" be turned over to or for the benefit of Clarkson. In addition to Shaheen's sworn response to Clarkson's information subpoena, Clarkson also developed further confirmatory evidence that this transaction was a mere gift by Shaheen to his wife. This included the fact that Shaheen, in his federal gift tax return for 1979, signed on April 14, 1980, reported that he *gave* his one-half interest in the estate to his wife and estimated the value of the gift at $215,000, or half the value of the estate on the date of the conveyance as evidenced by an appraisal of the property attached to the return. Because of what Shaheen now asserts, I note specifically that the return clearly claims that the entire $215,000 transfer was in the form of a gift; it does not indicate that any part of the transfer was for consideration.

Clarkson attacks the conveyance as fraudulent on two grounds. First, Clarkson alleges that the transfer was a fraud under New York Debtor and Creditor Law § 273–a because the conveyance was made without fair consideration at a time when Shaheen was a defendant in an action for money damages and Shaheen has since failed to satisfy the judgment in that action. Second, Clarkson contends that the gift violated section 276 of the law because it was a conveyance made with intent to defraud creditors.[16]

At the hearing on these issues, Barbara Shaheen, in testimony before me, attempted to defend against these allegations by claiming, for the first time, that the conveyance was not a gift after all, but was a sale from her husband to her for fair consideration. In brief, Mrs. Shaheen testified that the United States Internal Revenue Service had placed a mortgage of approximately $175,000 on the Southampton property to secure an existing personal income tax liability of Mrs. Shaheen; that Mr. Shaheen allegedly satisfied this personal debt with monies Mrs. Shaheen raised by selling some of her own stock; and that in consideration of Mrs. Shaheen using her own money to satisfy what was alleged to be Mr. Shaheen's debt, Mr. Shaheen allegedly agreed to transfer his interest in the Southampton estate to her.

At the hearing, Mr. Shaheen also adopted this characterization of the transaction, describing the conveyance of his interest in the estate as a sale in consideration of his wife's providing him with funds necessary to satisfy his personal tax liability to the United States.

I find this asserted defense to Clarkson's petition to be utterly false. To begin with the Shaheens at all times publicly denominated the transfer a gift. In addition, the Shaheens produced no writing of any kind supporting this version of the transaction and the tax liability, which was some $40,000 less than the value of the alleged consideration, was in fact a liability of both Mr. and Mrs. Shaheen. Moreover, one Martin Gilmartin, Esq., a Southampton attorney who assisted Mrs. Shaheen with the transfer, reminded her, orally and in a letter—which she told him she would discuss with husband—that Mr. Shaheen would have to file a gift tax return reporting the gift and

16. Clarkson also alleges a third ground for undoing the transaction under the Debtor and Creditor Law, namely, that the conveyance was made without fair consideration at a time when Shaheen was insolvent, in violation of section 273 of that law. In view of my disposition of Clarkson's claims under sections 273–a and 276, I need not reach the question of Shaheen's solvency on October 1, 1979.

that they should reduce the value of the gift by the amount of any consideration she had actually given in order to preserve, to the maximum extent possible, the exemption from taxation for *inter vivos* and testamentary gifts from one spouse to the other. Yet, despite this advice, Shaheen and his own lawyer, after telling Gilmartin that they would handle the gift tax return, reported no consideration for the transfer on the return Shaheen ultimately filed.

The record in this proceeding, therefore, compels the conclusion that Shaheen's conveyance to his wife of his one-half interest in the estate was a gift and that the alleged agreement whereby Mrs. Shaheen sold some of her stock to pay the tax liability in consideration of Mr. Shaheen's transfer to her of his interest in the estate is a recent fabrication supported only by perjury. I conclude, therefore, that the conveyance was without fair consideration.

On October 1, 1979, the day of the gift, Shaheen was a defendant in an action before me for money damages. That action went to trial some seven months later, resulting in a judgment against Shaheen personally of $46 million, and there is no dispute that, notwithstanding extensive supplementary proceedings, John M. Shaheen has failed to satisfy any part of the judgment against him. Accordingly, I conclude under section 273–a of the New York Debtor and Creditor Law that Shaheen's gift of his one-half interest in the estate known as "Old Trees" to his wife was a fraudulent conveyance. Furthermore, I find that the Shaheens' belated attempt to convert what was a gift in late 1979 into a sale in 1981 is sufficient evidence to permit me to infer that they intended, by this deceit, to defraud Mr. Shaheen's creditors, and specifically Clarkson. Accordingly, I conclude further that Shaheen's conveyance of his interest in the estate, followed by his and Mrs. Shaheen's subsequent effort to fabricate a more advantageous explanation for it, is also a fraudulent conveyance within the meaning of section 276 of the New York Debtor and Creditor Law. This conveyance is therefore set aside as one in fraud of creditors.

Clarkson contends that Shaheen's fraudulent conveyance has terminated the tenancy by the entirety by which the Shaheens owned "Old Trees" prior to Shaheen's gift of his interest to his wife and that the Court's equitable annulment of the gift will leave the Shaheens as tenants in common. Such a result would not follow from John Shaheen's fraud alone. *Orbach v. Pappa,* 482 F.Supp. 117, 120–1 (S.D.N.Y.1979); *Hohenrath v. Wallach, supra.* Here, however, Mrs. Shaheen was a partner in a fraudulent endeavor to retain the entire property for herself and gave false testimony as to consideration in furtherance of that fraud. I conclude that where the transferee tenant participates in the fraud, equity permits her to be stripped of her right of survivorship as against the creditor she tried to defraud. Were it otherwise, then that which she was unable to accomplish by fraud, she would be able to accomplish merely by outliving her husband. Such a result, I conclude, would offend justice. *See Van Alstyne v. Tuffy,* 103 Misc. 455, 169 N.Y.S. 173 (Sup.Ct.Monroe Co. 1918).

This result, of course, permits a sale of Shaheen's interest for Clarkson's benefit whereby any purchaser and Mrs. Shaheen would continue as tenants in common. It also increases the value of the interest to be sold for Clarkson's benefit, thereby maximizing both the return to the judgment creditor and the degree of satisfaction of the judgment debtor's liability. Accordingly, the tenancy by the entirety is terminated, and Clarkson may deliver to the Sheriff of Suffolk County an execution directing the sale, pursuant to CPLR § 5236, of Shaheen's interest in the estate for Clarkson's benefit.

## THE FOUNDERS PROCEEDING

Finally, I turn to Clarkson's challenges to certain transactions and agreements between Founders and SNR, Shaheen, and Macmillan (the "Founders proceeding"). In this proceeding, Clarkson asks the Court to declare 1) that its rights to a certain block of 23,517 shares of Macmillan preferred

stock are superior to the rights of Macmillan; 2) that Founders' pledge to Macmillan of 343,758 shares of Macmillan common stock was a fraudulent conveyance; and, 3) that Clarkson is entitled to certain monies Founders owes to SNR and Shaheen.

As to the Macmillan preferred stock, I find as follows. During the latter part of 1979, the Macmillan board explored the merits of creating a class of preferred stock and then issuing a preferred stock dividend payable to the holders of its common stock. Subsequently, on January 10, 1980, after consultation with two outside advisors, the board approved the issuance of such a class of preferred stock and voted to distribute the 173,092 new shares as a dividend on its common stock.[17] An investment banker estimated the market value of the new stock at $45 per share, or ninety percent of the $50 liquidating preference of the stock. Thus, SNR, with thirteen and a half percent of the outstanding Macmillan common stock, was entitled to 23,517 shares of the new preferred issue, at the time worth approximately $1,060,000.

The purpose of issuing the preferred class and distributing it as a common stock dividend was apparently to create what eventually would become a seasoned preferred stock which could be used as a vehicle for raising capital for construction of the proposed West Coast refinery. The fact was that it also gave rise to a liability to SNR at a time when SNR's debt to Macmillan, by then nearly $4 million plus interest, already had been written off as uncollectible.

Whatever the reason for issuing the preferred stock, it is clear that the dividend allocable to SNR's Macmillan common was not distributed to SNR. Instead, Macmillan retained the 23,517 shares, apparently to apply them against the SNR debt, and instructed Chemical Bank, its stock transfer agent, to issue the shares to Macmillan to be held as treasury shares.

The accounting treatment of the alleged setoff posed a problem, however, because, as noted above, Macmillan had already written off the SNR debt, leaving nothing on the balance sheet to be reduced to reflect the setoff.[18] In order to take ownership of the stock, therefore, Macmillan would have had to treat its value as income in 1980. Coopers & Lybrand, however, objected to recognizing the retained stock as income because were SNR to have gone bankrupt within one year of the setoff, the transaction could have been set aside as a voidable preference benefiting an insider. Consequently, Macmillan recorded the stock on its books as an asset and made a corresponding entry in a liability account to reflect a debt to SNR for unpaid dividends.[19]

Clarkson's first objection to this setoff is that it was never completed because of Macmillan's failure or inability to credit and thereby reduce SNR's debt account by the value of the preferred stock retained. Clarkson contends that a creditor's failure to reflect a proposed setoff by properly reducing the debt account of the debtor on the books of the creditor results in the creditor's waiver of its setoff right. The applicable law is well-stated in *Baker v. National City Bank of Cleveland*, 511 F.2d 1016, 1018 (6th Cir. 1975): "the act of setoff is . . . complete . . . [when] three steps have been taken: (1) the decision to exercise the right, (2) some action which accomplishes the setoff and (3) some record which evidences that the right of setoff has been exercised." *See also, Aspen Industries, Inc.*

17. The dividend was one share of preferred for every ten shares of common.

18. Macmillan has, however, reported in the notes to its various financial statements that it has offset the retained dividends against the SNR debt, but that pending a determination of the legality of the setoff it has not recognized the dividends as income or treated the retained preferred shares as treasury shares for purposes of its financial statements.

19. Macmillan has also retained cash dividends on its common stock which would be payable to SNR and has treated them similarly for accounting purposes, i.e., it has claimed a setoff against the SNR debt and has recorded the retained dividends in both an asset and a liability account.

v. *Marine Midland Bank*, 74 A.D.2d 59, 62, 426 N.Y.S.2d 620, 622 (4th Dep't 1980), *rev'd on other grounds*, 52 N.Y.2d 575, 439 N.Y.S.2d 316, 421 N.E.2d 808 (1981).

What is troublesome here is the fact that whatever Macmillan intended to do or had a right to do, its perfection of that right is somewhat clouded by the fact that it carried, and still carries, the SNR preferred stock on its books as an asset for which it is liable to SNR. The continued treatment of this property in a manner permitting later turnover to Shaheen's SNR, if that should suit the parties' purposes, is wholly consistent with Macmillan's utter failure to try to collect the SNR debt or to foreclose on Shaheen's stock in the Rubin escrow, which was purportedly to guarantee that debt. Indeed, in the prior year, 1979, Macmillan helpfully engineered a series of related company transactions in the fall of 1979 which 1) enabled SNR to make payments to its *other* creditors sufficient to stave off probable bankruptcy and ultimate collapse; and 2) protected the Macmillan stock owned by SNR. First, Macmillan, the only liquid corporation, bought 100,000 shares of Macmillan common from Shaheen's Founders Corporation at $4.75 per share. Founders then took the cash and bought 95,000 shares of Macmillan common from SNR at $5.00 per share. These two transactions put nearly $500,000 in cash in SNR's hands, which it promptly used to pay off its most persistent creditors,[20] and put the Macmillan shares in Founders. These payments apparently prevented the filing of an involuntary bankruptcy petition and enabled SNR to maintain its position without seriously affecting Shaheen's control of Macmillan. One must note, however, that Macmillan, the facilitator of the SNR bailout, received nothing in repayment of SNR's $4,000,000 debt to it.

Apparently still concerned about SNR's stability as holder of additional Macmillan shares, the Shaheen group also arranged for an additional 100,000 shares of Macmillan common to be moved from SNR to the safer haven of Founders. Rather than pay for that stock, however, which would have made cash available to pay claims of SNR's creditors including part of Macmillan's $4,000,000 claim, and notwithstanding that Founders already owed SNR more than $1,500,000 in open advances or on account, *see infra*, Founders simply gave SNR a note for $500,000 which, while reciting a due date of November 1, 1981, was accompanied by a letter from Founders to SNR stating that Founders could take an additional four years to pay if it did not have the money on November 1, 1981.[21]

The foregoing is recited in some detail to make manifest the fact that Macmillan's intent throughout these recent years has been first and foremost to maximize its freedom of action by promoting the welfare of such of the Shaheen companies as needed assistance at any given time. In this situation that meant that Macmillan would carry the preferred stock on its books as a liability to SNR while at the same time denominating it a setoff in the narrative portions of its annual statements. However, while it is clear that as with all these transactions, this one was structured to perpetuate Shaheen's control of Macmillan,[22] I conclude that here Macmillan would have gone the final step to make the stock its own but for the opposition of Coopers & Lybrand. Faced with the approximately $4,000,000 bad debt of SNR and Shaheen's directive

20. Actually, SNR never had possession of the entire $500,000. Rather than passing the cash to Founders which would then pass it on to SNR at the consumation of the stock transfers, Macmillan took approximately $100,000 of its own cash and paid some of the SNR creditors immediately. Accounts among Macmillan, SNR, and Founders were settled upon the execution of the stock sale agreements.

21. The letter, written by Shaheen on behalf of SNR to Founders, states, in relevant part, "the November 1, 1981 due date will, upon your request, be extended to November 1, 1985."

22. The cross-examination of Macmillan vice-president Hibdon on this issue culminated in the following question and answer:

Q. And it was the consistent goal [of Macmillan] to keep control of Macmillan in Mr. Shaheen's hands through his control of Founders and SNR?

A. It might appear that way. But—yes.

that they not foreclose on his guarantee of that debt, not even the Macmillan directors, notwithstanding their utter subservience to Shaheen, could have taken this newly-created asset in their hands, and done other than apply it against the theretofore-abandoned obligation of SNR.

I therefore conclude that by retaining the stock and declaring a setoff in its annual reports, Macmillan satisfied the essential requirements of *Baker v. National City Bank of Cleveland, supra.*[23] Consequently, Clarkson's petition for a turnover of this stock is denied.

Clarkson next challenges Founders' pledge to Macmillan of 343,758 shares of Macmillan's own common stock to secure Macmillan's guarantee of a commercial bonding company's appeal bond of $709,000 for Clarkson's judgment against Founders. Although Founders' obligation to Clarkson on the judgment itself was thus bonded, Founders owed SNR and Shaheen, both of which are also judgment debtors of Clarkson, millions of dollars, and it is to garnish those debts that Clarkson pursues this stock.

To that end, Clarkson caused first a restraining notice and later an execution with notice to garnishee to be served on Macmillan with respect to debts allegedly owed by Macmillan to Founders. Macmillan failed to pay anything to the Sheriff or to Clarkson in connection with these garnishments, and, on March 6, 1981, Clarkson moved for an order setting aside Founders' pledge to Macmillan.

The facts surrounding this pledge are as follows. On July 22, 1980, Clarkson entered judgment against Founders for $548,392 together with accrued interest since March 13, 1976. Founders president, Milton Hibdon, attempted to bond the judgment with a $709,000 bond from Union Indemnity Insurance Company. Because of Founders' tenuous financial condition, however, Union Indemnity was unwilling to provide a bond without collateral, and would not accept Founders' only significant asset, its Macmillan stock, for that purpose. Hibdon was told, however, that if he put up 10% of the bond in cash and obtained an acceptable indemnitor, Union Indemnity would provide the bond.

Upon inquiry from Founders, Macmillan agreed to act as indemnitor without fee if Founders deposited with Macmillan a block of Founders' Macmillan stock worth twice the amount of the indemnification obligation.[24] Founders thereupon delivered to Macmillan as a pledge 343,758 shares of Macmillan common stock, which at the time was worth approximately twice Macmillan's proposed obligation. Founders also agreed to idemnify Macmillan for any loss Macmillan might incur. After receiving the security, Macmillan executed the guarantee with Union Indemnity, Founders deposited ten percent in cash, and the bond issued.

Clarkson challenges Founders' pledge on two grounds. First, it contends that the July 31, 1980 transfer of the shares to Macmillan was in violation of this Court's order of July 1, 1980 enjoining the transfer of assets by Founders and the other judgment debtors pending entry of judgment. I conclude however, that the pledge of this asset, whether to Macmillan or to a stranger in order to bond this judgment, was an unexceptionable business transaction not within the intent or purpose of the July 1, 1980 order.

Clarkson also challenges the pledge as a fraudulent conveyance, pursuant to

23. The reasoning which leads me to this conclusion is equally applicable to Clarkson's claim that the retention of this stock was in some way a fraudulent conveyance as to creditors of SNR other than Macmillan. I do not perceive such motivation in this transaction.

24. Galpeer recommended that Macmillan obtain security equal to twice the amount of the obligation because Federal Reserve Board regulations governing margin stock transactions requires stock collateral to be equal to double the amount of the loan. He also said that the value of the Founders holdings should be discounted by ten to twenty percent in calculating the amount of security offered, because the sale of the stock owned by Founders, a control person of Macmillan under SEC regulations, was restricted.

section 273–a of the New York Debtor and Creditor Law, on the ground that it was made without fair consideration. Clarkson contends that because the value of the stock pledged was twice the amount of Macmillan's obligation, Founders did not receive a "fair equivalent" for the property it conveyed. The appropriate inquiry, however, is not whether the pledged stock and Macmillan's obligation were fair equivalents, but rather, whether the obligation was "not disproportionately small" compared to the collateral pledged. N.Y.Debt. & Cred.Law § 272(b).[25]

There is no dispute that, at the time of the pledge, the collateral was worth twice the obligation Macmillan undertook, and it is as of that time that the purported consideration must be judged. In this regard, as the parties in 1980 were aware, the price of Macmillan common had in recent years been subject to wide fluctuations. In the first quarter of 1979 the high bid had been 1¾; in the first quarter of 1980 it had been 8¾. Clearly, it was appropriate for Macmillan to take into consideration the nature of the collateral offered as security. Obviously, stock with a history of wide price swings provides poorer security than government bonds. It follows that the less stable the collateral, the more collateral a creditor is entitled to demand. This has been recognized in this Circuit as the law of the State of New York. *Troll v. Chase Manhattan Bank*, 257 F.2d 825, 829 (2d Cir. 1958). Given the nature of the collateral here, I conclude that the obligation Founders received in consideration of its pledge of stock was not disproportionately small as compared to the value of that stock. *See Epstein v. Goldstein*, 107 F.2d 755 (2d Cir. 1939).

Clarkson also contends that fair consideration for the pledge is lacking because the conveyance was made in the absence of good faith. I am constrained to observe that it is likely that Founders was quite satisfied to obtain its bond in this fashion in order to park its Macmillan shares with the one remaining viable corporation controlled by Shaheen, rather than pledge them to an insurance company. In this way, Founders might have reasoned, if Union Indemnity were required to pay the judgment, it would seek indemnity from Macmillan in cash, rather than by selling control stock of Macmillan to the highest bidder. In the end, therefore, if Founders' liability were upheld on appeal—it has been—and if Founders were unable to pay, Macmillan and the Shaheen group might well be able to retain control of this stock.

Despite this possible motivation for structuring the arrangement by which Founders obtained its bond, I cannot conclude that the pledge was made in bad faith, for it appears to have been the only way to bond the judgment. In any event, the result of the transaction was that Clarkson's judgment was secured, and the result would have been no different had Founders pledged the stock directly to Union Indemnity. Accordingly, Clarkson's motion to set aside the pledge is denied.

I now turn to Clarkson's petition, pursuant to CPLR §§ 5225 and 5227, for an order directing Founders to comply with a notice of garnishment and execution on certain debts which Founders owes to SNR and Shaheen. Clarkson alleges that as of the date of the garnishment, Founders was indebted to SNR in the amount of $1,950,817 and to Shaheen in the amount of $534,293. These obligations are listed in Founders' Annual Report dated May 30, 1980 as follows:

(1) Founders was "obligated to SNR for open advances of $1,148,603" (paid down to $999,547 prior to garnishment);

(2) Founders was "obligated on a long-standing note payable to ... [SNR] in the amount of $451,270;"

(3) "In December of 1979 the company purchased from SNR 100,000 shares of

25. Section 272 provides:

Fair consideration is given for property or obligation, ....

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Macmillan common stock for which they (sic) issued an additional note payable of $500,000" due November 1, 1981;

(4) Founders "is obligated to its principal stockholder [Shaheen] in the amount of $534,293. Of this sum, $360,420 is represented by a note due to John M. Shaheen, in connection with a third party transaction in which the principal stockholder acted as nominee for the company.... The balance of $173,873 represents an open advance made by ... [Shaheen] to the company."

Notwithstanding a restraining notice and a subsequent execution with notice to garnishee served in December, 1980, Founders failed to pay anything to Clarkson or the Sheriff. Clarkson then commenced this proceeding on March 6, 1981.

Founders, SNR, and Shaheen individually have answered the petition as follows: with the respect to the debt described in the Founders annual report as a note due SNR in the amount of $451,270, Founders states that a search of its records disclosed that there was no such note and that the annual report was in error. Founders and SNR both claim that this debt was a demand obligation which had not been called and was in fact barred by the statute of limitations. As to Founders' open-account indebtedness to SNR of $1,148,603, and the $500,000 note due November 1, 1981, Founders, SNR, and Shaheen contend that a moratorium on payment has been granted until 1987 and 1985, respectively. As to the $534,293 owed by Founders to Shaheen individually, Founders, SNR, and Shaheen contend that Shaheen had pledged the right to receive $173,873 of that to Macmillan pursuant to the 1977 guaranty agreement and that the balance, $360,420, was a contingent liability to Shaheen, which was extinguished by Founders' payment to another creditor, one Harry Dean.

Turning first to the alleged extensions to 1987 and 1985 of the time of repayment of Founders' obligations to SNR, Founders concedes the existence of these obligations, which, at the time Clarkson's notice of garnishment was served, consisted of $999,547 in open advances and a $500,000 note executed November 1, 1979. Founders contends, however, that by letter dated January 19, 1977, Shaheen, as president of SNR, granted Founders, of which he was the majority stockholder, a four-year moratorium on repayment of the advances in the event that Founders was unable "to meet the payment dates." The letter reads, in pertinent part, as follows:

> Because of the financial condition of Founders, and because we do not want to create an additional hardship for your company, if you are not able to meet the payment dates of any amount of money due to us, we hereby grant you a 48-month extension from any dates when payment is due.

Founders contends that a subsequent, similar letter from Shaheen on behalf of both himself and SNR to Founders on May 2, 1979, granted an *eight-year moratorium* on repayment of all of Founders' debts to SNR and Shaheen personally. This new moratorium—it obviously did not apply to the $500,000 note, which was executed six months later—allegedly was conditioned on Founders obtaining a mortgage loan from the Onondaga County Carpenters Pension Fund and on Founders' promise to prepay the loans to SNR and Shaheen if it was financially able. That letter, in pertinent part, reads as follows:

> [I]f the loan is granted, I John M. Shaheen personally, and Shaheen Natural Resources Company, Inc. of which I am President, will grant you an eight year moratorium on the payment of any and all funds due to either of us from the date you take down the monies from the Carpenters Pension Fund. This is all conditioned on your commitment to prepay these funds to me or Shaheen Natural Resources Company *if you are in such financial condition that you can do so* during this eight year moratorium period. (Emphasis supplied.)

Finally, Founders claims that a third letter from Shaheen as president of SNR, on November 1, 1979, the very day on which Founders gave the $500,000 note to SNR,

extended the November 1, 1981 due date of that note for an additional four years if Founders could not pay on November 1, 1981. That letter, in pertinent part, is as follows:

> In connection with the $500,000 you owe SNR for the purchase of Macmillan stock, the same condition regarding extension of due dates will prevail as contained in our letter to you dated January 19, 1977 attached hereto.
>
> Therefore the November 1, 1981 due date will, *upon your request, if you do not have the money to pay*, be extended to November 1, 1985. (Emphasis supplied.)

Clarkson attacks these purported extensions on three grounds: (1) they are "illusory" because they are conditioned only on inability to pay and because Shaheen, as sole stockholder and president of creditor SNR and as majority stockholder of debtor Founders, had complete discretion to decide when, if ever, to pay, in effect, himself; (2) the extensions amount to fraudulent conveyances because they were granted without consideration at times that SNR and Shaheen were defendants in the Clarkson action for damages, and they have since failed to satisfy the judgments against them in that action, N.Y.Debt. & Cred.Law § 273–a, and/or were made at times that they were insolvent, N.Y.Debt. & Cred.Law § 273; and (3) the extensions are fraudulent conveyances because they were made with actual intent to delay, hinder, or defraud creditors, N.Y.Debt. & Cred.Law § 276. Because I agree that the relevant extensions [26] were fraudulent conveyances made without consideration while SNR and Shaheen were defendants in an action for damages, I need not pass on Clarkson's other attacks on the extensions.

Section 273–a of the New York Debtor and Creditor Law provides:

> Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages . . ., is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

SNR and Shaheen became defendants in Clarkson's underlying action for damages in July, 1977, when Clarkson amended its March, 1976 complaint to add the damage claims that ultimately resulted in final judgments for Clarkson against both SNR and Shaheen of approximately $46 million. Both defendant-judgment debtors have failed to satisfy those judgments. Thus, under § 273–a, if the May 2, 1979 and November 1, 1979 extensions were conveyances and made without fair consideration, they were fraudulent conveyances as to Clarkson.

First, I conclude that the extensions were conveyances within the meaning of § 270 of the Debtor and Creditor Law. That section provides, in pertinent part: " '[c]onveyance' includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property and also the creation of any lien or incumbrance." The extensions of the indebtednesses here, if they are to have any meaning, represent releases of a valuable right, in this case the right of the transferor to demand immediate or timely payment of a demand debt or a note when due. Just as in the case of the attempted rollover of the indebtedness from the Shaheen defendants to NRC, which the jury in the underlying action found to be fraudulent, such a release is a conveyance. *See 348–352 West 27th Street Corp. v. Dropkin,* 178 Misc. 815, 36 N.Y.S.2d 740 (Sup.Ct.N.Y.Co. 1942.)

26. Only the two extensions granted in the May 2, 1979 and the November 1, 1979 letters are relevant. The letter of January 19, 1977, written before SNR became a defendant in Clarkson's action for money damages, granted a moratorium on the demand debts for only four years, or until January 19, 1981, a date which obviously has passed. Thus, even if the January 19, 1977 extension was valid as against creditors, Founders' indebtedness to SNR for open advances came due on January 19, 1981 and is, therefore, subject to Clarkson's garnishment in this proceeding. The validity of the further extension of this obligation in the May 2, 1979 letter is discussed in the body of the opinion.

In addition, I conclude that neither of these extensions of Founders' obligations was for fair consideration. Founders contends that the extension of May 2, 1979 was given in consideration of Founders bolstering its financial position by obtaining the mortgage loan from the Carpenters Pension Fund, thereby better enabling Founders to repay its obligations to SNR and Shaheen. I find, however, that the May 2, 1979 extensions had nothing to do with the Carpenters' loan. Significantly, while Hibdon, in an April 7, 1981 affidavit, stated that the Carpenters Fund had refused to make the loan unless SNR granted Founders a moratorium on payment and that Shaheen's May 2, 1979 letter was thereupon forwarded to the prospective lender, on his May 14, 1981 deposition by Clarkson, taken just five weeks later, Hibdon testified that he did not know whether obtaining the moratorium was a condition of the loan or whether Shaheen's letter was ever even shown to the lender. On this latter point, Shaheen himself testified, "I doubt we would circulate this stuff [the May 2, 1979 letter]."

The only other consideration that respondents allege was that, without the moratoria, Founders, in the words of John M. Shaheen, "would go bust[,] and that would collapse the rest of the [Shaheen corporate] structure." The balance of Shaheen's testimony, amplified by that of Hibdon, demonstrated that the extensions were granted to prevent the destruction of one supporting leg of the Shaheen body of corporations because, as is clear from facts discussed throughout this opinion, Shaheen's control of Macmillan depended on his continuing control of both SNR and Founders, which together owned nearly forty-two percent of the then-outstanding Macmillan common stock.

Shaheen correctly perceived the necessity of keeping all three of the main corporate ships afloat in order to maintain his control position at Macmillan. Thus, he testified, "[w]hen one of our companies has an intercompany debt and is pulling behind, it has always been our policy to aid them for the common good." It is clear from this testimony that SNR and Shaheen received nothing of legal cognizability in return for extending Founders' obligations to them. Indeed, Shaheen's explanation is an admission that all that was occurring was an intercorporate shuffling of assets and debts to make all the Shaheen corporations appear solvent. Such conduct is inherently fraudulent with respect to creditors, *see Republic Insurance Company v. Levy* 69 Misc.2d 450, 329 N.Y.S.2d 918, 921 (Sup.Ct. Rockland Co. 1972), and can in no way constitute consideration for these conveyances. In any event, these extensions occurred in the absence of good faith, an indispensable component of fair consideration. N.Y.Debt. & Cred.Law § 272; *Southern Industries, Inc. v. Jeremias*, 66 A.D.2d 178, 411 N.Y.S.2d 945 (2d Dep't 1978). Accordingly, as to Clarkson, the extensions were fraudulent conveyances within the meaning of § 273–a of the New York Debtor and Creditor Law and are hereby set aside. Clarkson is entitled to an order pursuant to C.P.L.R. §§ 5225 and 5227 directing Founders to pay to it $1,950,817 with appropriate interest.

I turn next to Clarkson's effort to enforce its garnishment of Founders' conceded debt to Shaheen for $173,873 of open advances. Founders argues that Shaheen pledged his right to receive this amount to Macmillan as part of the guaranty agreement executed on March 29, 1977. *See* the handwritten addition on Schedule B to the guaranty, at p. 912 *supra*. As earlier determined, however, *see* the Rubin Escrow, *supra*, this pledge was a sham. In addition, I found above that any purported extension of this demand debt was a fraudulent conveyance. Consequently, the present right to payment remains in Shaheen, and Clarkson is entitled to an order enforcing its garnishment of that debt.

I turn next to Clarkson's effort to garnish $451,270 due from Founders to SNR, and find as follows. Until the commencement of this garnishment effort in 1981 and a review of the files by its counsel, Founders never contested that the debt was and is due on demand. Indeed, Founders' annual report, dated May 30, 1980 and signed by its president, Hibdon, recites that Founders

was "obligated on a longstanding note payable to . . . [SNR] in the amount of $451,-270." As recently as March 20, 1981, the debt was carried on Founders' books as an open advance, and it has been carried in its trial balances for at least 1978, 1979 and 1980.

Founders, while conceding the existence of this indebtedness to SNR, contends that it arose in its entirety prior to December 31, 1970, and that SNR neither demanded payment nor commenced an action to compel payment within the period provided in the applicable statute of limitations. The limitations period in New York for an action based on an express or implied contractual obligation, such as the debt here in issue, is six years. N.Y.C.P.L.R. § 213(2). Thus, Founders argues, any action to collect on the debt, whether by SNR or by Clarkson standing in SNR's shoes as a judgment creditor, is barred by the statute of limitations.

Clarkson acknowledges that six years is the applicable limitations period, but argues that the obligation—if it ever became stale—has been revived, pursuant to § 17–101 of the New York General Obligations Law, because Founders has executed a writing or writings acknowledging the debt.[27]

An acknowledgment of a debt lifts the statutory bar against enforcement if it recognizes the debt and contains nothing inconsistent with an intention to pay it. *E.g., Curtiss-Wright Corp. v. Intercontinent Corp.*, 277 A.D. 13, 97 N.Y.S.2d 678, 681 (1st Dep't 1950). Whether a purported acknowledgment is sufficient to revive a debt obviously depends on the circumstances of each case. *In re Meyrowitz' Estate*, 114 N.Y.S.2d 541 (Surr.Ct.N.Y.Co.1952), *aff'd*, 284 A.D. 801, 132 N.Y.S.2d 327 (1st Dep't), *appeal denied*, 284 A.D. 844, 134 N.Y.S.2d 587 (1954).

Here, Founders' acknowledgment of its "longstanding" obligation to SNR in its 1980 annual report, dated May 31, 1981, and the fact that the debt was carried on Founders' books from at least 1978 through 1980, *see In re Meyrowitz' Estate, supra*, 114 N.Y.S.2d at 547, is a clear recognition of the continuing validity of the obligation. It is therefore not barred by the statute of limitations and Clarkson is entitled to compel its payment.

Clarkson also seeks damages for Founders' alleged violation of restraining notices served in Clarkson's attempt to garnish a certain contingent obligation from Founders to Shaheen individually. In April, 1963, Shaheen, as a "nominee" of Founders, purchased 600,700 shares of stock in the Mohican Corporation. It is alleged that because Founders was not in a position financially to buy the shares at the time, Shaheen made the purchase on behalf of the company. As part payment for the shares, Shaheen, in 1965, gave the seller, former Mohican president Harry Dean, his personal note for $360,420, payable May 1, 1968. Founders agreed to hold Shaheen harmless for the transaction and to make any payments to Dean for which Shaheen became obligated.

Apparently, in 1968, the note had not been paid, and Founders sued Dean seeking recission on the ground of fraud, and Dean sued Founders to enforce the contract. Four actions involving the transaction were filed and eventually consolidated in Supreme Court, New York County. The parties concluded a settlement in January, 1981, dismissing the actions and requiring Founders to pay Dean $75,000.

Clarkson contends that this settlement violated both the restraining notice and execution with notice to garnishee that Clarkson caused to be served on Founders on December 12, and December 19, 1980, respectively. The restraining notice and gar-

27. General Obligations Law, § 17–101 reads in pertinent part:

> An acknowledgment or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract whereby to take an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and rules . . . .

nishment forbade Founders to sell, assign, transfer, interfere with, pay over, or dispose of any debt it owed to Shaheen. N.Y.C.P.L.R. §§ 5222(b), 5232(a). Clarkson asserts that Founders' promise to assume Shaheen's obligation to Dean, in the event that such obligation ever arose, was a contingent debt subject to garnishment pursuant to C.P.L.R. § 5201. *Cf. Abkco Industries, Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 385 N.Y.S.2d 511, 350 N.E.2d 899 (1976).

Although Clarkson is clearly correct in characterizing Founders' obligation to Shaheen as a contingent obligation, a debt is subject to garnishment under C.P.L.R. § 5201(a) only if it is past due, due on demand, or certain to become due.[28] Here, Founders' obligation to hold Shaheen harmless was contingent upon Shaheen becoming obligated to Dean under the note Shaheen gave Dean in 1965. Such an obligation is not a debt that is past due, due on demand, or certain to become due. I conclude, therefore, that it is not a debt subject to garnishment under C.P.L.R. § 5201(a). *E.g., Glassman v. Hyder*, 23 N.Y.2d 354, 296 N.Y.S.2d 783, 244 N.E.2d 259 (1968). Nor is the obligation herein subject to attachment as a property interest, as was held in the *Abkco* case, *supra.* N.Y.C.P.L.R. § 5201(b). In *Abkco*, the existence of the obligation was not in question, but rather whether any positive balance ultimately would be due under the obligation. Consequently, § 5201(a) did not bar attachment there. Here, however, Clarkson's garnishment occurred at a time when Founders was not yet obligated to Shaheen under its agreement to hold him harmless because the contingency had not arisen. Thus, when Clarkson served its notices, attachment was precluded under § 5201(a). *See Katz v. Umansky*, 92 Misc.2d 285, 399 N.Y.S.2d 412 (Sup.Ct. Kings Co. 1977); *Donawitz v. Danek*, 42 N.Y.2d 138, 397 N.Y.S.2d 592, 366 N.E.2d 253 (1977) (Jasen, J., concurring); *cf. Abkco Industries, Inc. v. Apple Films, Inc., supra; Bata Shoe Co., Inc. v. Silvestre Segarra E Hijos, S. A.*, 58 A.D.2d 133, 396 N.Y.S.2d 369 (1st Dep't 1977). Accordingly, Clarkson's petition for damages arising from Founders' conduct in the Dean matter is denied.

The parties are directed to submit a proposed order, on notice, effectuating all the foregoing.

28. Section 5201(a), in pertinent part, reads as follows:

(a) *Debt against which a money judgment may be enforced.* A money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor, whether it was incurred within or without the state, to or from a resident or non-resident, unless it is exempt from application to the satisfaction of the judgment.